UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | | |
|---|---|---|
| JOSEPH EDWARD BOVIN BELSKIS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | 1:15-cv-00091-JAW |
| | ) | |
| DT DEVELOPERS INC., et al., | ) | |
| | ) | |
| Defendants. | ) | |

**ORDER ON MOTION TO DISMISS AND FOR JUDGMENT
ON THE PLEADINGS**

A federal inmate claims that various federal, municipal, and individual actors, including a medical contracting business and several of its employees, violated his civil rights in connection with his pretrial detention at the Somerset County Jail pending the resolution of his federal criminal charges. In particular, the inmate alleges that these actors failed to address his serious medical condition in violation of the Eighth Amendment. The medical contracting business' employees and its parent corporation move for judgment on the pleadings under Federal Rule of Civil Procedure 12(c). Because the medical defendants have failed to address whether their actions were sufficient in view of the potentially serious medical consequences of inaction, the Court denies the motion, preferring to address the liability issue in the context of a motion for summary judgment with a more fully developed factual and legal record.

## I.    BACKGROUND

### A.    Procedural History

On March 6, 2015, Joseph Belskis filed a complaint against Terry Thurlow, doing business as Maine MedPro Associates (MedPro), as well as the State of Maine Board of Corrections, the County of Somerset, and the United States Marshals Service.  *Compl.* (ECF No. 1).  MedPro filed a motion to dismiss on June 30, 2015. *Def.'s Mot. to Dismiss* (ECF No. 32).  Mr. Belskis subsequently moved to amend his Complaint on July 23, 2015.  *Letter Mot. to Amend Compl.* (ECF No. 39).  Additionally, he filed a notice dismissing all medical negligence claims against MedPro on July 27, 2015. *Notice of Voluntary Dismissal* (ECF No. 41).  On August 11, 2015, MedPro filed a limited opposition to the motion to amend the Complaint.  *Obj. to Pl.'s Mot. to Amend Compl.* (ECF No. 50).

On August 31, 2015, the Magistrate Judge issued a recommended decision advising the Court to (1) grant Mr. Belskis' motion to amend his Complaint, (2) dismiss as moot the portion of MedPro's motion to dismiss relating to Mr. Belskis' medical negligence claims, and (3) deny the remainder of MedPro's motion to dismiss. *Recommended Decision* (ECF No. 53).  The Court adopted the Magistrate Judge's Recommended Decision on October 14, 2015.  *Order Affirming the Recommended Decision of the Magistrate Judge* (ECF No. 57).  That same day, Mr. Belskis filed an amended complaint.  *Am Compl.* (ECF No. 59).  The Amended Complaint added several individual MedPro employees as defendants, including Robert Ellis, Lisa

Cates, Mary Patterson, Rhonda Walters, and Trina Littlefield, as well as a Jane Doe and John Doe. *Am Compl.* (ECF No. 59).

MedPro and its employees filed an answer to the Amended Complaint on December 4, 2015. *Answer, Defenses and Affirmative Defenses to Pl.'s First Am. Compl.* (ECF No. 80) (*Answer*). On December 11, 2015, MedPro and its employees filed a motion to dismiss and for judgment on the pleadings. *Mot. to Dismiss and for J. on the Pleadings* (ECF No. 84) (*Mot. for J.*). Mr. Belskis filed a response in opposition to the motion on March 18, 2016. *Pl.'s Opp'n to Mot. to Dismiss* (ECF No. 102) (*Pl.'s Opp'n*). On the same day, Mr. Belskis also filed a motion to amend the Amended Complaint to substitute DT Developers Inc. for Maine MedPro Associates and its principal, Terry Thurlow. *Mot. to Amend the Compl.* (ECF No. 103). On March 22, 2016, MedPro filed a limited objection to clarify that DT Developers Inc. is the parent corporation of Maine MedPro Associates. *Def.'s Limited Obj. to Pl.'s Mot. to Amend* (ECF No. 104). On March 24, 2016, the Magistrate Judge granted the motion to substitute DT Developers Inc. in place of both Maine MedPro Associates and its principal, Terry Thurlow. *Order Granting Without Obj. Mot. to Amend Compl.* (ECF No. 105). The Magistrate Judge instructed the parties that there was no need to file an amended complaint or additional responsive pleadings. On March 29, 2016, DT Developers Inc. and the individual MedPro employees filed a reply to Mr. Belskis' opposition to their motion to dismiss. *Def.'s Reply to Pl.'s Obj. to Mot. to Dismiss and for J. on the Pleadings* (ECF No. 107) (*Def.'s Reply*).

### B.    Factual Allegations

### 1.    The Parties

Joseph Belskis is a resident of the state of Maine.  *Am. Compl.* at 15.  At the time of the events alleged in the Complaint, he was in the legal custody of the United States Marshals Service and in the physical custody of the state of Maine Department of Corrections at the Somerset County Jail.  *Id.*

DT Developers Inc. is the parent corporation of Maine MedPro Associates.  *Mot. to Amend the Compl.* at 1; *Def.'s Limited Obj. to Pl.'s Mot. to Amend* at 1.  MedPro is a private medical contractor that provides medical services to state and federal inmates at the Somerset County Jail.  *Am. Compl.* at 15.

At the time of the events alleged in the Complaint, MedPro employed Robert Ellis as a physician assistant and Lisa Cates, Mary Patterson, Rhonda Walters, and Trina Littlefield as registered nurses.  *Id.* at 20–21; *Mot. for J.* at 15–20.  These individual defendants provided professional medical care to inmates at the Somerset County Jail.  *Id.*

The Amended Complaint also alleges that MedPro employed a "Jane Doe" and "John Doe."  Both Jane Doe and John Doe appear in the caption of the case and the body of the Complaint identifies Jane Doe as "Barbara" and John Doe as "John," both as nurses employed by MedPro.  *Am. Compl.* at 20–21.  However, Mr. Belskis never makes any specific allegations against them in the Amended Complaint.  MedPro, in turn, fails to mention the claims against Jane and John Doe in its motion; Mr. Belskis fails to mention them in his response; and MedPro does not mention them in its reply.

4

In the absence of any mention of the Doe Defendants by the parties in the pending motion, the Court is reluctant to assume that Mr. Belskis, who is acting pro se, either has no or could obtain no information that would allow for a claim against these Defendants.  Typically, discovery reveals the true identity of Jane and John Doe defendants and their exact actions.  The Court, therefore, concludes that it is more appropriate for their liability to be resolved in the context of a motion for summary judgment.[1]

### 2.    The Alleged Facts[2]

### a.    Background

Mr. Belskis was diagnosed with diabetes in 1998.  *Am. Compl.* ¶ 5.  His treatment regimen includes insulin, metformin, and specialized footwear.  *Id.*  Diabetes can cause foot ulcers that, if left untreated, can lead to osteomyelitis, an infection of the bone.  *Id.* ¶¶ 5–6.  Mr. Belskis previously required two amputations due to the effects of osteomyelitis.  *Id.* ¶ 6.

On May 3, 2012, Mr. Belskis was taken into custody and placed at the Oxford County Jail.  *Id.* ¶ 7.  At the time of his arrest, Mr. Belskis was wearing his diabetic

---

[1]    If MedPro had mentioned the claims against Jane and John Doe in its motion, at least Mr. Belskis would have been on notice that MedPro was seeking to dismiss them and could have responded. It strikes the Court as unfair to dismiss Defendants not mentioned in the motion.

[2]    In considering a motion to dismiss, a court is required to "accept as true all the factual allegations in the complaint and construe all reasonable inferences in favor of the plaintiff [ ]."  *Sanchez v. Pereira-Castillo,* 590 F.3d 31, 41 (1st Cir. 2009) (quoting *Alternative Energy, Inc. v. St. Paul Fire & Marine Ins. Co.,* 267 F.3d 30, 33 (1st Cir. 2001)).

In addition, although it is generally true that a court may not consider documents outside the complaint without converting a motion into one for summary judgment, there is an exception "for documents the authenticity of which are not disputed by the parties;…for documents central to plaintiffs' claim; or for documents sufficiently referred to in the complaint." *Alt. Energy, Inc.*, 267 F.3d at 33 (1st Cir. 2001) (quoting *Watterson v. Page*, 987 F.2d 1, 3 (1st Cir. 1993)).

footwear. *Id.* ¶ 8. The staff at the Oxford County Jail permitted Mr. Belskis to continue wearing his specialized shoes. *Id.* The following day, the United States Marshals Service took custody of Mr. Belskis and transferred him to the Androscoggin County Jail. *Id.* ¶ 9. The staff at the Androscoggin County Jail initially took away Mr. Belskis' diabetic shoes but returned them the following day. *Id.* At first, the staff administered Mr. Belskis' insulin irregularly. *Id.* Mr. Belskis soon developed sores on the bottom of his feet that required debridement at a local medical center. *Id.* at 9–10. Thereafter, Androscoggin staff provided Mr. Belskis with bandages to care for the sores and permitted Mr. Belskis to wear his diabetic shoes for the remainder of his time at the facility. *Id.* ¶¶ 11–12.

### b.   Transfer to Somerset County Jail

On November 5, 2012, the Marshals Service transferred Mr. Belskis to the Somerset County Jail (SCJ). *Id.* ¶ 13. Mr. Belskis arrived in his diabetic footwear with his diabetes medications. *Id.* Shortly after his arrival, the SCJ corrections staff confiscated Mr. Belskis' diabetic shoes because they violated jail security policies. *Id.*

A few hours later, Nurse Patterson examined Mr. Belskis. *Id.* She told Mr. Belskis that his diabetes medications would change and informed him that he had a red spot on the bottom of a foot. *Id.* Mr. Belskis believed that the wounds that had developed during his incarceration at the Oxford and Androscoggin facilities had healed. *Id.* Nurse Patterson also submitted a written request to the SCJ corrections staff, asking them to permit Mr. Belskis to retain his diabetic shoes. *Answer* Attach.

1 *Exhibit Medical Intake* at 11 (ECF No. 79) (*Intake*).  The SCJ corrections staff denied Nurse Patterson's request.  *Id.*

On November 6, the day after the SCJ corrections staff confiscated his diabetic shoes, Mr. Belskis wrote to the medical staff to ask that the jail provide him with diabetic shoes that would not run afoul of the jail's security policies.  *Answer* Attach. 6 *Exhibit Medical Chart-General* at 1 (ECF No. 79) (*Medical Chart*).  Two days later, Nurse Cates, a medical supervisor, responded in writing that "[t]his is not something the jail will do.  You can have another pair dropped off.  Normally only jail issued shoes are allowed."  *Id.*  That same day, Nurse Cates made an entry in the medical file about Mr. Belskis' amputation history resulting from past cases of osteomyelitis. *Am. Compl.* ¶ 14.

On November 8, Mr. Belskis orally requested that the medical staff return his diabetic shoes, but his request was again denied.  *Id.*  Without his diabetic shoes, Mr. Belskis had no choice but to wear prison-issued footwear.  *Id.* ¶ 15.  This footwear created pressure on his feet and caused additional red spots to appear.  *Id.*

c.      **Development of Foot Ulcers**

By December, the red spots on his feet had developed into wounds and ulcers. *Id.* ¶ 16.  On December 1, Mr. Belskis submitted a written medical request to obtain proper diabetic footwear and to see a doctor about his diabetic ulcers.  *Medical Chart* at 2.  Three days later, on December 4, Physician Assistant Ellis (P.A. Ellis) examined Mr. Belskis.  *Id.* at 3.  P.A. Ellis noted that:

> Mr. Belskis is a diabetic who's had amputations of toes and chronic diabetic foot ulcers.  He [wears] orthotics shoe[s] and this was

discontinued upon his arrival here.  [He] [w]ould like to wear them so I'm going to ask the nursing staff to discuss this with administrative staff to see if they will allow his specialized shoes.

*Id.*  On December 6, Mr. Belskis submitted another medical request seeking an update on his diabetic shoes.  *Id.* at 5; *Am. Compl.* ¶ 16.  The same day, a MedPro employee responded, "We are checking into it."  *Medical Chart* at 5.  On December 7, Nurse Cates notified Mr. Belskis in writing that the SCJ corrections staff again refused to allow Mr. Belskis to wear his original diabetic shoes.  *Id.*

On December 8, Mr. Belskis asked in writing if "the Federal Bureau of Corrections would pay for a pair of diabetic soft shoe sneakers for my ongoing problem with diabetic ulcers on my feet.  So these shoes would <u>not</u> be a security risk at any facility I have to enter."  *Id.* at 11 (emphasis in original).  Five days later, on December 13, P.A. Ellis requested that the Marshals Service approve an appointment for Mr. Belskis with Pine Tree Orthopedics.  *Id.* at 17.  The Marshals Service approved the request the same day.  *Id.*

On December 16, Mr. Belskis reported oozing blisters on his little toe to the medical staff.  *Am. Compl.* ¶ 18.  He showed the blisters to Nurse Walters and explained that the blisters were symptomatic of the onset of osteomyelitis.  *Id.* ¶¶ 18–19.  He also stated that he "would like clog type shower shoes."  *Medical Chart* at 18.  On December 18, P.A. Ellis examined the blisters, but he informed Mr. Belskis that the blisters were not the result of tissue breakdown.  *Am. Compl.* ¶ 19.  P.A. Ellis ordered daily dry dressing changes and a pair of Crocs for Mr. Belskis.  *Id.*  During Mr. Belskis' visit to medical staff on December 20, he reported that he liked the Crocs

because they did not rub as much.  *Answer* Attach. 2 *Exhibit Nursing Notes* at 2 (ECF No. 79) (*Nursing Notes*).

According to Mr. Belskis, Crocs are not prescription footwear for diabetics.  *Am. Compl.* ¶ 19.  Mr. Belskis maintains that P.A. Ellis knew that ordering Crocs was inappropriate and contrary to the medical need for diabetic shoes.  *Id.* ¶ 20.  Mr. Belskis asserts that P.A. Ellis knew that Mr. Belskis required diabetic shoes but ordered Crocs instead because of the jail's security policy.  *Id.*  Starting December 19, MedPro staff began changing Mr. Belskis' dressings daily and cleaning his wounds with normal saline.  *Nursing Notes* at 2–3.

### d.    Visits to Specialists

On December 28, Mr. Belskis attended an appointment with Dr. Bruce MacDonald at Pine Tree Orthopedics.  *Am. Compl.* ¶ 26.  Mr. Belskis presumed that the purpose of the appointment was to obtain proper diabetic footwear.  *Id.*  By this point, Mr. Belskis' toe was very painful.  *Id.* ¶ 27.  Dr. MacDonald expressed concern regarding the advancement of osteomyelitis, *id.* ¶ 26, and recommended that Mr. Belskis see "a wound care specialist immediately."  *Medical Chart* at 24.  He also advised Mr. Belskis not to wear the Crocs.  *Am. Compl.* ¶ 26.  Although Dr. MacDonald did not have any diabetic shoes that would fit Mr. Belskis in stock, he said that he could order and manufacture a custom pair for the inmate.  *Medical Chart* at 24.

Four days later, on January 2, 2013, P.A. Ellis wrote to the Marshals Service seeking authorization for Mr. Belskis to see a wound care specialist.  *Id.* at 30.  On

9

January 4, MedPro staff scheduled an appointment at the Maine General Hospital Wound Clinic for January 10. *Id.* at 25. In the meantime, the MedPro staff continued to clean his wound with saline and change his dressings daily. *Nursing Notes* at 4–7. However, medical notes reflect that on the morning of January 4, a nurse reported that Mr. Belskis' entire foot was swollen and "extremely firm and warm," and that Mr. Belskis reported pain extending into his shin. *Id.* at 6. The nurse recorded the condition and changed the dressing. *Id.*

Later that day, Mr. Belskis returned to the medical staff complaining of an "infected foot with pain in his shin." *Id.* at 7. The medical notes indicate that the medical staff began administering antibiotics on the night of January 4. *Id.* According to Mr. Belskis, however, MedPro staff did not provide antibiotics until January 7, 2013. *Am Compl.* ¶¶ 27, 29. At this point, he had three open wounds on his foot, and the foot was swollen and painful. *Id.* ¶¶ 27–28. The nursing staff continued to clean Mr. Belskis' wounds with saline and change his dressings daily. *Nursing Notes* at 7–9.

On January 10, Mr. Belskis attended his wound care appointment, where Dr. Lisa Sauer examined the infected foot, debrided the wounds, ordered an MRI, and treated the infection. *Am. Compl.* ¶ 29. Mr. Belskis states that Dr. Sauer indicated in her medical notes from the January 10 appointment that his wounds resulted from improper footwear. *Id.*[3] Later that day, Dr. Sauer contacted Nurse Walters at the jail to inquire about the status of Mr. Belskis' diabetic shoes. *Nursing Notes* at 9.

---

[3] Dr. Sauer's January 10 notes do not appear among the medical records attached to the MedPro Defendants' Answer. However, Dr. Sauer's notes from a later appointment do appear.

Nurse Walters informed Dr. Sauer that "orthopedic approval goes through corrections administration." *Id.* Nurse Walters also assured Dr. Sauer that Mr. Belskis "is not being neglected here…we are doing what is medically necessary under corrections [and] US Marshal[] guidelines." *Id.* at 9–10. From January 10 through January 18, the nursing staff continued to tend to Mr. Belskis' wound with saline. *Id.* at 10–11. The nursing staff also switched to an Aquacel dressing per Dr. Sauer's instructions. *Id.* By January 18, Mr. Belskis' wound had sealed, so the nurses discontinued the daily dressings. *Id.* at 11.

Four days after his wound care appointment, Mr. Belskis wrote to MedPro staff to follow up on his appointment with Pine Tree Orthotics and to inquire about his MRI appointment. *Medical Chart* at 32. On January 15, Nurse Cates responded, "As explained to you by myself last week I am working with Pine Tree Orthopedic and wound care about your shoes. You are scheduled for an MRI. You will follow up with wound care clinic after MRI." *Id.* That same day, MedPro staff wrote to the Marshals Service seeking funding for Mr. Belskis' diabetic shoes. *Id.* at 34.

Mr. Belskis returned to Pine Tree Orthopedics on January 17, 2013, to make molds of his feet, presumably to manufacture new footwear. *Am. Compl.* ¶ 30. That same day, Mr. Belskis made an additional written request for wound care because Dr. Sauer's wound treatment was temporary and required aftercare. *Id.* ¶ 31.

### e.   Diagnosis of Osteomyelitis

On January 18, Mr. Belskis underwent an MRI. *Id.* ¶ 32. Dr. Anthony Van Dyck interpreted the results and confirmed that Mr. Belskis suffered from a bone

infection consistent with the presence of osteomyelitis. *Medical Chart* at 34. Mr. Belskis saw Dr. Sauer on January 30 to discuss the results further. *Am. Compl.* ¶ 34. Dr. Sauer informed Mr. Belskis that the infection had not improved and that lack of treatment within the jail exacerbated his condition. *Id.* ¶ 32. She discussed his treatment options, *Medical Chart* at 37, and advised Mr. Belskis that there was a high likelihood that the infected areas and bones would require amputation. *Am. Compl.* ¶ 34. Despite Dr. Sauer's assessment, Mr. Belskis asserts that the medical staff at the jail made no immediate changes to Mr. Belskis' medication or wound treatment. *Id.* ¶ 34.

> Mr. Belskis submitted a written grievance on February 5:
>
> Health Care Provider: this was my ongoing point to you and staff about [the] severity of my medical issues with my feet and the importance of having diabetic shoes from November 5, 2012 on. [Now] some 88 days later, Dr. Lisa Sauer from Waterville's General Hospital tells me of my [] bone infection. Don't you think that scheduling visits for [a] Vancomyacin antibiotics [regimen] and surgery of the infected bone should be done in a timely [manner] so [there is] less of a chance of more bone infection[?]

*Medical Chart* at 41.

On February 15, Mr. Belskis consulted with Dr. James Timoney at Central Maine Orthopedics regarding possible amputation. *Am. Compl.* ¶ 35. On February 19, Mr. Belskis received new diabetic shoes, presumably from Pine Tree Orthopedics. *Id.* ¶ 36. These shoes were substantially the same diabetic footwear that the corrections staff took from Mr. Belskis upon his arrival at the Somerset County Jail. *Id.*

12

### f.    Amputation

On March 1, Mr. Belskis consulted once again with Dr. Timoney and received antibiotics in anticipation of the surgical amputation.  *Id.* ¶ 38.  On March 11, Dr. Timoney amputated Mr. Belskis' small toe and fifth metatarsal.  *Id.*  Mr. Belskis returned to the jail and was placed in the infirmary for one week with a prescription of oxycodone for pain.  *Id.* ¶ 39.  Although the prescription called for Mr. Belskis to receive the medication in six-hour intervals, he did not receive his medication on that schedule.  *Id.* ¶¶ 44–45.  During the week in the infirmary, Mr. Belskis could not walk.  *Id.* ¶43.  The medical staff at the jail provided Mr. Belskis with a wheel chair and changed his bandages every other day.  *Id.*

Following the amputation, Mr. Belskis received his diabetes medications on a more regular basis, was permitted to wear his diabetic footwear, and received more medical attention than prior to the amputation. *Id.* ¶ 48.  Mr. Belskis' detention at the Somerset County Jail ended on August 30, 2013.  *Id.* ¶ 47.

### C.    Counts in the Amended Complaint

Mr. Belskis alleges that MedPro, acting under color of law, created policies designed to provide a minimal amount of medical services to inmates. *Am. Compl.* at 2.   According to Mr. Belskis, MedPro and its employees implemented and administered these policies, resulting in a denial of medical care, treatment, and services. *Id.* at 22.  Mr. Belskis claims that the actions of MedPro and its employees constituted cruel and abusive treatment and deliberate indifference in violation of the Eighth Amendment, as applied to the states by the Fourteenth Amendment. *Id.*

at 23.  Mr. Belskis also brings corresponding claims under the Maine Civil Rights Act.  *Id.*

## II.   THE PARTIES' POSITIONS

### A.   The Defendants' Motion to Dismiss and For Judgment on the Pleadings

MedPro[4] and the individual MedPro employees (collectively, the MedPro Defendants) assert that Mr. Belskis' Amended Complaint fails to set forth a plausible claim for relief under the United States Constitution or the Maine Civil Rights Act. Accordingly, the MedPro Defendants seek judgment on the pleadings pursuant to Rule 12(c).[5]

The MedPro Defendants assert that "allegations of 'substandard care, malpractice, negligence, [and] inadvertent failure to provide care…are all insufficient to prove a constitutional violation.'"  *Mot. for J.* at 13 (quoting *Ruiz-Rosa v. Rullan*, 485 F.3d 150, 156 (1st Cir. 2007) (citations omitted)).  Rather, they maintain that Mr. Belskis "must establish that the treatment and care he received involved…'deliberate indifference to serious medical needs.'"  *Id.* (quoting *Ruiz-Rosa v. Rullan*, 485 F.3d at 156).  They point out that the Eight Amendment requires that "[t]he care must have been so inadequate as to shock the conscience."  *Id.* at 13–14 (quoting *Feeney v. Corr.*

---

[4]      Initially, Maine MedPro Associates, Terry Thurlow, and the individual MedPro employees moved for judgment on the pleadings.  Subsequently, the parties substituted DT Developers Inc. for Maine MedPro Associates and Terry Thurlow.  For clarity and consistency, the Court continues to refer to MedPro—rather than DT Developers Inc.—as the entity providing medical service to the inmates at the Somerset County Jail.  The Court understands that DT Developers Inc. is the actual party standing in for MedPro.

[5]      Although their motion states that they "move pursuant to Rules 12(b)(1), (5), and (6) and Rule 12(c)," *Mot. for J.* at 1, the MedPro Defendants only assert relief under Rule 12(c) based on Mr. Belskis' failure to state a claim.

*Med. Servs. Inc.*, 464 F.3d 158, 162 (1st Cir. 2006) (citation omitted)). Accordingly, the MedPro Defendants claim that Mr. Belskis' allegations "fall woefully short of a constitutional violation." *Id.* at 11.

### 1.    Individual MedPro Employees

The MedPro Defendants contend that Mr. Belskis must assert facts sufficient to state a plausible claim against each individual defendant. *Id.* at 14. That is, Mr. Belskis must plead that "each Government-official defendant, through the official's own individual actions, has violated the Constitution." *Id.* (citing *Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009)). The MedPro Defendants then analyze Mr. Belskis' allegations with respect to each individual employee and conclude that Mr. Belskis fails to state a plausible claim against any of them.

### a.    P.A. Ellis

The MedPro Defendants maintain that there is no basis for Mr. Belskis to establish that P.A. Ellis was deliberately indifferent to his medical needs. *Id.* at 19. They assert that P.A. Ellis requested the return of Mr. Belskis' diabetic shoes in December, and that when he learned that the SCJ staff would not return the shoes, he sought to obtain new diabetic shoes for Mr. Belskis. *Id.* at 18. The MedPro Defendants claim that in the meantime, P.A. Ellis ordered a pair of Crocs at Mr. Belskis' request, *id.*, and ensured that MedPro staff "saw to Plaintiff's ulcer care issues through outside consultation and individual nursing treatment." *Id.* Following the diagnosis of osteomyelitis, P.A. Ellis consulted with Mr. Belskis

concerning his treatment options.  *Id.*  Based on these facts, the MedPro Defendants argue that the Court should dismiss the claims against P.A. Ellis.

### b.    Nurse Cates

The MedPro Defendants describe Nurse Cates as Mr. Belskis' primary nursing contact.  *Id.* at 16.  They allege that Nurse Cates followed up with the SCJ corrections staff regarding Mr. Belskis' diabetic shoes on two occasions and that Nurse Cates requested approval for new footwear "[w]hen it was clear that new shoes were needed[.]"  *Id.*  Further, the MedPro Defendants generally state that Nurse Cates was not deliberately indifferent to Mr. Belskis' wound care.  *Id.*  They point out that once Mr. Belskis made a formal complaint about his ulcers on November 30, a physician assistant saw him within three days.  *Id.* at 16–17.

### c.    Nurse Patterson

According to the MedPro Defendants, on the day Mr. Belskis arrived at the jail, Nurse Patterson conducted his intake, obtained his medical records from the Androscoggin County Jail, and continued his insulin regimen.  *Id.* at 15.  Additionally, Nurse Patterson wrote to the SCJ corrections staff asking that Mr. Belskis be allowed to keep his diabetic shoes.  *Id.*  The MedPro Defendants assert that these facts do not support Mr. Belskis' generalized allegations of deliberate indifference.

### d.    Nurse Walters

The MedPro Defendants insist that the Court should dismiss the claims against Nurse Walters because her role in Mr. Belskis' care was extremely limited.  *Id.* at 19.  They allege that Nurse Walters followed up with Mr. Belskis regarding his

December 16 medical request for Crocs. *Id.* She also fielded a telephone call from Dr. Sauer on January 10 relating to Mr. Belskis' care. *Id.* This, the MedPro Defendants assert, cannot support a claim of deliberate indifference. *Id.*

### e.   Nurse Littlefield

The MedPro Defendants claim that the allegations against Nurse Littlefield cannot even be considered "threadbare recitals" of a constitutional claim. *Id.* at 20 (citing *Iqbal*, 556 U.S. at 663). According to the MedPro Defendants, Nurse Littlefield "merely provided routine care which was well documented." *Id.*

### 2.   Municipal Liability

Turning to the potential liability of MedPro as an entity, the MedPro Defendants contend that the doctrine of respondeat superior does not apply to claims under § 1983. *Id.* at 23 (citing *Gaudreault v. Municipality of Salem*, 923 F.2d 203, 209 (1st Cir. 1990)). Rather, they explain that Mr. Belskis must show that "a policy or custom of [a governmental employer] led to the constitutional deprivation alleged." *Id.* (citing *Santiago v. Fenton*, 891 F.2d 373, 381 (1st Cir. 1989)).

The MedPro Defendants claim that Mr. Belskis asserts "no *specific* allegations of any policy or custom of the entity that has led to a constitutional deprivation." *Id.* (emphasis in original). They point out that the SCJ corrections staff—not MedPro—made the decision to confiscate Mr. Belskis' diabetic shoes upon arrival. *Id.* Moreover, they assert that Mr. Belskis "has not alleged that any of the individual MedPro employee defendants acted in violation of his constitutional rights *as the direct result* of a MedPro policy or custom. *Id.* (citing *Santiago*, 891 F.2d at 381)

(emphasis in original).   According to the MedPro Defendants, Mr. Belskis'
"[t]hreadbare" assertions are not sufficient to state a claim against MedPro, and
therefore DT Developers Inc. is entitled to judgment.  *Id.* at 23–24.

### B.      The Plaintiff's Response

Mr. Belskis writes that the "dominant theory underlying [his] claims is the
deliberate indifference of the Med Pro staff[.]"  *Pl.'s Opp'n* at 13.  He maintains that
his allegations satisfy the deliberate indifference standard because the MedPro
Defendants were "aware of the facts from which the inference could be drawn that a
substantial risk of serious harm exists" and because the MedPro Defendants actually
drew that inference.  *Id.* (citing *Leavitt*, 645 F.3d at 492).

To demonstrate that the MedPro Defendants had the requisite awareness, Mr.
Belskis points to the MedPro Defendants' Answer and their attached medical
exhibits.  *Id.* at 6.  He alleges that the admissions in the Answer show that the
MedPro Defendants "were cumulatively aware of [Mr. Belskis'] pre-existing condition
and the medical nexus between [diabetes], toe amputations, wound care, and diabetic
shoes."  *Id.*  Mr. Belskis also references reports by Dr. Sauer and P.A. Ellis[6] to
highlight that the MedPro Defendants were aware that a substantial risk of serious

---

[6]      The MedPro Defendants argue that P.A. Ellis' memorandum is not properly before the Court
because such information is confidential.  *Def.'s Reply* at 5 (citing 10 M.R.S. § 8003-B).  Section 8003-
B, however, provides that the records are confidential only "during the pendency of the investigation,"
*id.* at § 8003-B(1), and MedPro has failed to establish whether the investigation is still pending.
Furthermore, the treatment records may be disclosed if the patient signs an executed written release.
*Id.* at § 8003(2-A)(A).  Here, it is the patient himself who is reciting the P.A. Ellis memorandum.  In
addition, the known existence of an opinion by P.A. Ellis on the circumstances of the case, if favorable
to the Plaintiff, would strongly suggest that the Court should deny the Defendants' motion for
judgment on the pleadings so that the Plaintiff would have the opportunity to obtain the essence of
the Ellis memorandum in admissible form.  Finally, the Ellis memorandum is cumulative.  The Court
rejects the Defendants' objection to the reference to P.A. Ellis' memorandum.

harm existed if Mr. Belskis did not receive diabetic shoes and proper treatment. *Id.* at 7.

### 1.   Individual MedPro Employees

Mr. Belskis further asserts that each of the named MedPro Defendants are individually liable because each was directly responsible for his care.[7, 8] *Id.* at 11. Mr. Belskis points out that the MedPro Defendants "did nothing for the first two months" even though he had a known history of diabetes and previous diabetic amputations from osteomyelitis. *Id.* at 14. He insists that each of the employees ignored the risks of osteomyelitis and the concurrent bone infection while they awaited his scheduled appointments. *Id.* He posits that "when the Court takes into consideration the standards of care of diabetic inmates by the Maine Department of Corrections…the only question the trier of fact would be left with regarding these defendants is why they took so long to recognize [his] condition" and provide proper treatment. *Id.* at 3.

Mr. Belskis also asserts individualized allegations against certain MedPro employees. He claims that P.A. Ellis admitted that the prison-issued footwear was not proper. *Id.* at 11. Additionally, he alleges Nurse Cates observed his developing wounds but failed to provide a suitable alternative to the prison-issued canvas footwear. *Id.* at 11. Mr. Belskis submits that Nurse Patterson observed the red spot

---

[7]   Here, Mr. Belskis reasserts allegations against Terry Thurlow. *Pl.'s Opp'n* at 9. However, Mr. Thurlow is no longer a party to the case, and thus the Court will not address the allegations against him.

[8]   Mr. Belskis also references a "Defendant LaPlant." *Pl.'s Opp'n* at 12. However, Defendant LaPlant does not appear in the caption of the Amended Complaint, and there is no indication that Mr. Belskis served this individual with notice of the lawsuit. Accordingly, the Court will not address the allegations against Defendant LaPlant.

on his foot during his intake interview, yet she did not inform the jail staff of its medical implications or take any actions to protect him from the risks of wearing non-diabetic shoes. *Id.* at 12. Finally, Mr. Belskis asserts that he gave notice to Nurse Walters about the oozing sores on his feet, *id.* at 11, and that she knew that his footwear was not proper following her telephone conversation with Dr. Sauer. *Id.*

### 2.   Municipal Liability

Mr. Belskis also maintains that MedPro's policies and practices "restricted the delivery of necessary medical services…despite the known risks of the Plaintiff's condition." *Id.* at 10. Mr. Belskis contends that DT Developers Inc. is liable because MedPro's customs and practices denied him appropriate medical services, and that MedPro's delay and failure to act exacerbated his medical condition. *Id.* (citing *Welch v. Ciampa*, 542 F.3d 927, 941 (1st Cir. 2008); *Young v. City of Providence*, 404 F.3d 4, 26 (1st Cir. 2005)).

### C.   The Defendants' Reply

In their Reply, the MedPro Defendants take issue with Mr. Belskis' reference to the Maine Department of Corrections standards of inmate care. *Def.'s Reply* at 2. They assert that the "standard of care is an appropriate analysis in a medical negligence case," not a case based on § 1983. *Id.* Moreover, they point out that the standards are not part of the record and that Mr. Belskis' reference to the standards in his Amended Complaint do not speak to specific diabetes treatment standards. *Id.*

The MedPro Defendants also dispute Mr. Belskis reliance on Dr. Sauer's January 10, 2013 medical notes to demonstrate deliberate indifference. *Id.* at 3. They

insist that Mr. Belskis ignores a number of "critical facts." *Id.* In particular, they assert that Mr. Belskis did not complain of a foot problem until November 30, 2012. *Id.* Moreover, by the time Dr. Sauer wrote her note on January 10, the MedPro staff had twice requested the return of Mr. Belskis diabetic shoes from the SCJ corrections staff, and Mr. Belskis had already consulted with an orthotic specialist. *Id.* Additionally, the MedPro staff attended to Mr. Belskis on December 5–8, 12–13, and nearly every day thereafter until the end of January. *Id.* This, according to the MedPro Defendants, does not demonstrate deliberate indifference.

### 1.   Individual MedPro Employees

After restating the applicable legal standards, the MedPro Defendants reexamine Mr. Belskis' allegations with respect to each individual employee and conclude that Mr. Belskis fails to state a plausible claim against any of them. *Id.* at 4–8. To demonstrate that Mr. Belskis offers only "threadbare" allegations, the MedPro Defendants point out that Mr. Belskis does not even mention Nurse Littlefield in his response to their motion. *Id.* at 7.

### 2.   Entity Liability

The MedPro Defendants again claim that Mr. Belskis sets forth no specific allegations of any MedPro policy or custom that led to a constitutional deprivation. *Id.* at 8. Moreover, they reassert that Mr. Belskis has not alleged that any of the individual MedPro employees acted in violation of his constitutional rights as a direct result of a specific policy or custom. *Id.* Thus, the MedPro Defendants claim that DT Developers Inc. is entitled to judgment.

### III.   LEGAL STANDARD

According to Rule 8(a), "[a] pleading that states a claim for relief must contain . . . a short and plain statement of the claim showing that the pleader is entitled to relief." FED. R. CIV. P. 8(a)(2).  The United States Supreme Court has observed that "the pleading standard Rule 8 announces does not require 'detailed factual allegations,' but it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Iqbal*, 556 U.S. at 678.  Although unrepresented litigants "are not exempt from procedural rules, [the court holds] pro se pleadings to less demanding standards than those drafted by lawyers and endeavors, within reasonable limits, to guard against the loss of pro se claims due to technical defects." *Dutil v. Murphy,* 550 F.3d 154, 158 (1st Cir. 2008).

"After the pleadings are closed—but early enough not to delay trial—a party may move for judgment on the pleadings." FED. R. CIV. P. 12(c).  "A motion for judgment on the pleadings is treated like a Rule 12(b)(6) motion to dismiss..." *Portugues-Santana v. Rekomdiv Int'l Inc.*, 725 F.3d 17, 25 (1st Cir. 2013) (citing *Pérez-Acevedo v. Rivero-Cubano*, 520 F.3d 26, 29 (1st Cir. 2008)).  As with a motion to dismiss, to withstand a Rule 12(c) motion, a complaint must contain enough factual allegations so that the claim is "plausible on its face." *Gianfrancesco v. Town of Wrentham,* 712 F.3d 634, 638–39 (1st Cir. 2013) (quoting *Iqbal,* 556 U.S. at 678 (quoting *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570 (2007)).  In other words, the factual content pleaded should raise the right to relief "above a speculative level," *Perez–Acevedo,* 520 F.3d at 29 (quoting *Twombly,* 550 U.S. at 555), and "allow[ ] the

court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal,* 556 U.S. at 678.  In deciding whether to grant judgment for the moving party, the Court must "accept all of the nonmovant's well-pleaded factual averments as true, and draw all reasonable inferences in [its] favor." *Rivera–Gomez v. de Castro,* 843 F.2d 631, 635 (1st Cir. 1988) (citations omitted).

In addition, "when 'a complaint's factual allegations are expressly linked to—and admittedly depend upon—a document (the authenticity of which is not challenged),' then the court can review it upon a motion to dismiss." *Alt. Energy, Inc. v. St. Paul Fire & Marine Ins. Co.*, 267 F.3d 30, 34 (1st Cir. 2001) (quoting *Beddall v. State St. Bank & Trust Co.*, 137 F.3d 12, 17 (1st Cir. 1998)); *see also Trans-Spec Truck Serv., Inc. v. Caterpillar Inc.*, 524 F.3d 315, 321 (1st Cir. 2008) (explaining that a court may consider any documents attached to the complaint when ruling on a motion to dismiss, including any other documents "'integral to or explicitly relied upon in the complaint, even though not attached to the complaint'") (quoting *Clorox Co. P.R. v. Proctor & Gamble Commercial Co.*, 228 F.3d 24, 32 (1st Cir. 2000)).

## IV.   DISCUSSION

Mr. Belskis references medical records from the SCJ facility in his Amended Complaint, and the MedPro Defendants attach several of the relevant documents to their Answer as exhibits.  Mr. Belskis affirms that the authenticity of these medical exhibits is not in dispute and specifically requests the Court to take them into account when considering the MedPro Defendants' motion.  Because the parties do not challenge the authenticity of these documents, and because these documents are

23

integral to the pleadings, the Court will consider the documents in evaluating the motion to dismiss. *See Alt. Energy*, 267 F.3d at 34; *Trans-Spec Truck Serv.*, 524 F.3d at 321.

Mr. Belskis brings federal claims under 42 U.S.C. § 1983 and state claims under the Maine Civil Rights Act. Because "[t]he disposition of a 42 U.S.C. § 1983 claim also controls a claim under the [Maine Civil Rights Act]," the Court analyzes Mr. Belskis' federal and state claims co-extensively. *Cady v. Walsh*, 753 F.3d 348, 356 (1st Cir. 2014) (citing *Berube v. Conley*, 506 F.3d 79, 85 (1st Cir. 2007)).

### A.   Individual MedPro Employees

To succeed on an Eighth Amendment claim based on inadequate or delayed medical care, an inmate must satisfy both an objective and a subjective standard. *Leavitt*, 645 F.3d at 497. To satisfy the objective prong, the inmate must show that the medical need was "serious." *Kosilek v. Spencer*, 774 F.3d 63, 82 (1st Cir. 2014) (citing *Estelle v. Gamble*, 429 U.S. 97, 103 (1976)). A medical need is "serious" if "it is one that has been diagnosed by a physician as mandating treatment, or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Leavitt*, 645 F.3d at 497 (quoting *Gaudreault*, 923 F.2d at 208). "The 'seriousness' of an inmate's needs may also be determined by reference to the effect of the delay of treatment." *Id.* at 497–498 (citing *Gaudreault* 923 F.2d at 208).

To satisfy the subjective standard, the inmate must show that "prison officials possessed a sufficiently culpable state of mind, namely one of 'deliberate indifference' to an inmate's health or safety[.]" *Id.* at 497 (citing *Burrell v. Hampshire County*, 307

F.3d 1, 8 (1st Cir. 2002)).  "Deliberate indifference" requires that "the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference."  *Id.*  (quoting *Farmer v. Brennan*, 511 U.S. 825, 837 (1994)).  This standard encompasses a "narrow band of conduct."  *Id.* (quoting *Feeney* 464 F.3d at 162).  Mere subpar care amounting to negligence or even malpractice does not give rise to a constitutional claim.  *Id.* (citing *Feeney*, 464 F.3d at 162).  Rather, the treatment must have been so inadequate as to constitute "an unnecessary and wanton infliction of pain" or to be "repugnant to the conscience of mankind."  *Id.* (quoting *Estelle v. Gamble*, 429 U.S. at 105–106).  Deliberate indifference occurs when an official "culpably ignores or turns away from what is otherwise apparent," *id.* (citing *Alsina–Ortiz v. Laboy*, 400 F.3d 77, 82 (1st Cir. 2005), or when an official makes medical decisions recklessly with "actual knowledge of impending harm, easily preventable."  *Id.* (quoting *Ruiz–Rosa*, 485 F.3d at 156).

Here, it was the SCJ corrections staff—not the individual MedPro employees—who made the decision to confiscate Mr. Belskis' diabetic shoes upon his arrival at the facility.  The question turns to whether the individual MedPro employees' delay in obtaining new diabetic shoes and treating Mr. Belskis' wounds violated his Eighth Amendment rights.

### 1.    Objective Inquiry

There can be no question that Mr. Belskis' medical needs were "serious."  Mr. Belskis has diabetes, a serious medical condition that can prove fatal if not treated

properly.  Moreover, Mr. Belskis claims that his diabetes made him susceptible to foot ulcers and osteomyelitis, another serious medical condition that can require amputation of the infected bone.  Indeed, the MedPro employees were aware that Mr. Belskis required two previous amputations as a result of past cases of osteomyelitis.

In the present case, Dr. MacDonald expressed concern about osteomyelitis when he first examined Mr. Belskis on December 28, 2012, and recommended that Mr. Belskis see a wound care specialist immediately.  An MRI later confirmed the diagnosis of osteomyelitis on January 18, 2013.  Ultimately, the osteomyelitis led to the amputation of Mr. Belskis' toe on March 11, 2013.  The physicians' diagnoses and the subsequent amputation establish that Mr. Belskis' medical needs were objectively serious.  *See Leavitt*, 645 F.3d at 497 ("The 'seriousness' of an inmate's needs may also be determined by reference to the effect of the delay of treatment") (citing *Gaudreault* 923 F.2d at 208).

## 2.    The Subjective Inquiry

Whether the individual MedPro employees were deliberately indifferent to Mr. Belskis' serious medical condition is a closer question.  On one hand, the First Circuit makes clear that when an inmate objects to a particular course of treatment—as opposed to a lack of medical care—courts should be reluctant to find a constitutional violation.  *Sires v. Berman*, 834 F.2d 9 (1st Cir. 1987); *Watson v. Canton*, 984 F.2d 537 (1st Cir. 1993) ("The courts have consistently refused to create constitutional claims out of disagreements between prisoners and doctors about the proper course of a prisoner's medical treatment, or to conclude that simple medical malpractice rises

to the level of cruel and unusual punishment"). Thus, to the extent that Mr. Belskis disagrees with the manner in which the MedPro staff treated his diabetes, ulcers, or osteomyelitis, the Court should be reluctant to find a constitutional violation. Such disagreements are better suited to a claim of medical malpractice.

On the other hand, a prison official may be deliberately indifferent if the official "knows of and disregards an excessive risk to inmate health or safety." *Farmer*, 511 U.S. at 837. The official must (1) be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists and (2) actually draw the inference. *Id.*; *Leavitt* 645 F.3d at 497 (deliberate indifference may exist when an official "ignores or turns away from what is otherwise apparent" or makes decisions about medical care recklessly with "actual knowledge of impending harm, easily preventable") (internal citations omitted). To the extent that Mr. Belskis alleges that the MedPro employees were aware of the substantial risks of harm resulting from a lack of diabetic shoes and that the employees' lack of essential care resulted in amputation, he may have a valid constitutional claim, and judgment on the pleadings would be inappropriate. *See Feeney* 464 F.3d at 163 ([D]eliberate indifference may be found where the attention received is 'so clearly inadequate as to amount to a refusal to provide essential care'").

In this case, Mr. Belskis alleges that the MedPro staff knew that Mr. Belskis suffered from diabetes and that he previously required amputations due to past cases of osteomyelitis. Moreover, the MedPro employees were aware that the SCJ corrections staff confiscated Mr. Belskis' diabetic shoes and that he was forced to wear

the prison-issued canvas shoes.  Despite their knowledge of Mr. Belskis' history of foot ulcers, osteomyelitis, and amputations, the MedPro employees waited until after Mr. Belskis formally complained of developing foot ulcers to seek appropriate shoes for him.  This was more than a month after the SCJ corrections staff initially confiscated Mr. Belskis' shoes.

Mr. Belskis filed his first formal complaint on December 1, 2012.  Three days later, P.A. Ellis examined Mr. Belskis and asked the nurses to seek the return of Mr. Belskis' diabetic shoes from the SCJ corrections staff.  On December 13, after it became apparent that the SCJ corrections staff would not return Mr. Belskis' original diabetic shoes, P.A. Ellis scheduled a consult with Pine Tree Orthopedics. Meanwhile, on December 16, Mr. Belskis again complained of foot ulcers.  P.A. Ellis examined Mr. Belskis on December 18 and ordered a daily dry dressing change and Crocs.  From December 18 to the Pine Tree Orthopedics appointment, the nursing staff changed Mr. Belskis' dressings and cleaned his wound with saline solution.

By the time Mr. Belskis arrived his Pine Tree Orthopedics appointment, his condition caused Dr. MacDonald to "strongly recommend[] that [Mr. Belskis] see a…wound care specialist immediately."  Despite this admonition, MedPro employees waited five days to seek approval for an appointment with a wound care specialist. In the meantime, the MedPro employees continued to change Mr. Belskis' dressings and clean his wound with saline.  By the morning of January 4, Mr. Belskis' foot was swollen and "extremely firm and warm."  Nursing notes indicate that a nurse wrapped the wound with a dressing.  Later that day, after Mr. Belskis returned

complaining of an "infected foot," it appears that a nurse contacted P.A. Ellis and obtained an order for antibiotics.  Mr. Belskis alleges that he did not receive antibiotics until three days later on January 7th.

On January 10, Mr. Belskis had his appointment with Dr. Sauer, the wound care specialist.  Nursing notes from that day indicate that Dr. Sauer called the prison and that Nurse Walters reassured the doctor that Mr. Belskis was "not being neglected."  Mr. Belskis alleges that he did not receive proper follow-up care after his visit with Dr. Sauer.  An MRI on January 18 confirmed that Mr. Belskis suffered from osteomyelitis.  Later in January, Mr. Belskis met with Dr. Sauer to discuss treatment options, including amputation.

Throughout this time, Mr. Belskis did not have access to diabetic shoes.  He received his shoes on February 19, over three months after he arrived at the jail.  Mr. Belskis underwent amputation on March 11.

These facts, which the Court takes as true for purposes of the motion, indicate that the MedPro employees were aware of a substantial risk of amputation resulting from osteomyelitis.  Mr. Belskis came to the facility with only eight toes.  He was wearing diabetic shoes when he arrived, and his medical records described a history of foot ulcers and osteomyelitis.  Construing these facts in the light most favorable to Mr. Belskis, the Court holds that it is plausible that the MedPro employees (1) were aware of facts from which the inference could be drawn that a substantial risk of serious harm existed and (2) that they actually drew the inference. *Farmer*, 511 U.S.

at 842 ("A factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious").

Moreover, it is plausible that a factfinder could conclude that MedPro's treatment of Mr. Belskis was so inadequate as to amount to a refusal to provide essential care. It is true that the MedPro staff saw Mr. Belskis almost on a daily basis from December 19, when P.A. Ellis ordered daily dry dressing changes. However, given the risks of amputations associated with foot ulcers and osteomyelitis, it is plausible that Mr. Belskis required essential care from the moment the SCJ corrections staff confiscated his diabetic shoes upon his arrival at the jail. Moreover, it appears that the MedPro employees' care of Mr. Belskis' wounds— consisting of dressing changes and saline cleaning—was clearly inadequate leading up to his appointment with Dr. MacDonald on December 28. Upon examining Mr. Belskis' condition, Dr. MacDonald concluded that Mr. Belskis required immediate attention from a wound care specialist. *See Ruffin v. Deperio* 97 F.Supp.2d 346, 353 (W.D.N.Y. 2000) ("[T]he mere fact that plaintiff was frequently examined and eventually referred to outside specialists is insufficient [to preclude a finding of deliberate indifference] when…the course of treatment was largely ineffective") (internal quotations omitted).

The delays in MedPro's treatment also evince a refusal to provide essential care. Despite Dr. MacDonald's recommendation of immediate wound care, the MedPro employees waited five days to seek authorization for an appointment with a wound care specialist. Moreover, even when Mr. Belskis presented a foot that was

swollen and extremely firm and hot, it appears that a nurse simply changed his dressing.  It was only when Mr. Belskis returned later that evening complaining of an infected foot that another nurse spoke with P.A. Ellis and ordered antibiotics. Again, Mr. Belskis claims that he did not receive these antibiotics for another three days.

Finally, when Dr. Sauer called the jail, a nurse felt it necessary to assure the doctor that Mr. Belskis was "not being neglected."  This interaction lends weight to Mr. Belskis' claim that the MedPro defendants were failing to provide essential care.

In light of the foregoing analysis, the Court concludes that Mr. Belskis has pleaded enough factual content to preclude the MedPro Defendants' motion for judgment with respect to the individual MedPro employees.  The facts, when taken as true and viewed in the light most favorable to Mr. Belskis, support an Eighth Amendment claim of inadequate care that is plausible on its face. *See Gianfrancesco*, 712 F.3d at 638–39.  That is, Mr. Belskis' allegations allow the Court to draw the reasonable inference that the MedPro employees were deliberately indifferent to Mr. Belskis' objectively serious medical condition. *Iqbal*, 556 U.S. at 678.  More generally, the Court recognizes that "rendition of judgment in such an abrupt fashion represents an extremely early assessment of the merits of the case," *Rivera-Gomez*, 843 F.2d at 635, and that "[p]ublic policy, affording each litigant a full and fair hearing on the merits, warrants against imprudent use of this motion."  *Nelson v. University of Maine System*, 914 F. Supp. 643, 647 (D. Me. 1996).  Thus, the Court prefers to develop a more complete factual record before issuing a ruling on the merits.

31

The MedPro Defendants assert correctly that Mr. Belskis must plead that each individual employee, through that employee's own actions, violated Mr. Belskis' constitutional rights. *Iqbal*, 556 U.S. at 676 ("[A] plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution"). However, "[b]ecause precise knowledge of the chain of events leading to the constitutional violation may often be unavailable to a plaintiff at [the pleading] stage of the litigation," *Ocasio-Hernandez v. Fortuno-Burset*, 640 F.3d 1, 16 (1st Cir. 2011), courts often must turn to "judicial experience and common sense," *Iqbal*, 556 U.S. at 679, to make "a contextual judgment about the sufficiency of the pleadings." *Sanchez v. Pereira-Castillo*, 590 F.3d 31, 48 (1st Cir. 2009).

The Court agrees with the MedPro Defendants that allegations against certain MedPro employees lack a degree of specificity. At the same time, the Court appreciates the difficulty that Mr. Belskis—a pro se litigant—faces in disentangling the precise circumstances that precipitated the alleged constitutional violation. These difficulties are at an apex at the pleading stage. Mindful of these difficulties, the Court denies the MedPro Defendants' motion for judgment because Mr. Belskis' allegations combined with the medical records presently before the Court permit the reasonable inference that each of the MedPro employees were deliberately indifferent to Mr. Belskis' objectively serious medical condition.

### B.   Municipal Liability

As an initial matter, the MedPro Defendants appear to concede that the standard for municipal liability applies to MedPro for purposes of determining

liability under § 1983 because it contracted to fulfill a governmental responsibility at the Somerset County Jail. *See Leavitt*, 645 F.3d at 504 (1st Cir. 2011) (applying municipal liability standard to claims against private medical services entity, but treating the issue as conceded); *Woodward v. Corr. Med. Servs. of Ill., Inc.,* 368 F.3d 917, 927 (7th Cir. 2004) (treating corporate entities as municipal entities in the context of § 1983 prison medical care actions).

A § 1983 claim against a municipal defendant will only be successful if the entity was responsible for a policy, custom, or practice that caused a constitutional violation. *Welch v. Ciampa,* 542 F.3d at 941. Proof of a municipal "policy, custom, or practice" involves two elements. First, the plaintiff must show that the policy, custom, or practice is "so well settled and widespread that the policymaking officials of the municipality can be said to have either actual or constructive knowledge of it yet did nothing to end the practice." *Miller v. Kennebec Cnty.*, 219 F.3d 8, 12 (1st Cir. 2000) (quoting *Bordanaro v. McLeod*, 871 F.2d 1151, 1156 (1st Cir. 1989). This first element can be described as the "culpability" or "fault" element. *Haley v. City of Boston*, 657 F.3d 39, 52 (1st Cir. 2011).

Second, the plaintiff must prove that the policy, custom, or practice was "the moving force" behind the deprivation of constitutional rights. *Miller*, 219 F.3d at 12 (quoting *Bordanaro*, 871 F.2d at 1156). This second element requires evidence of a "direct causal link between the policy and the violation." *Burrell*, 307 F.3d at 10. Together, these elements require the plaintiff to "identify a municipal 'policy' or 'custom' that caused the plaintiff's injury." *Cady v. Cumberland County Jail*, No.

2:10-CV-00512-NT, 2013 WL 3967486, at *34, 2013 U.S. Dist. Lexis 109195, at *108 (D. Me. Aug. 1, 2013) (quoting *Bd. of the Cnty. Comm'rs v. Brown*, 520 U.S. 379, 402 (1997)).

After reciting these elements, Mr. Belskis asserts that "MedPro created and implemented policies to provide the minimal amount of medical services to inmates, and whenever possible to deny medical treatment to inmates through delay and obfuscation…all ostensibly in an effort to save money[.]" *Am. Compl.* ¶ 3. Further, Mr. Belskis claims that MedPro's employees "followed these…policies and carried them out." *Id.* ¶ 4. These policies "restricted the delivery of necessary medical services to the Plaintiff in a clinically acceptable manner despite the known risks of the Plaintiff's condition." *Def.'s Opp'n* at 10.

The MedPro Defendants have not addressed whether medical contractors at prisons have a special obligation to alert prison staff and provide prophylactic care where an inmate's medical condition could lead to serious medical consequences. In this case, Nurse Patterson observed a red spot on Mr. Belskis' foot when he entered the prison facility. Medical records show that she made a note of the spot and asked the SCJ corrections staff if Mr. Belskis could keep his diabetic shoes. Following the corrections staff's denial of her request, there is no indication that Nurse Patterson, or any MedPro employee, educated the corrections staff regarding the significance of the diabetic shoes or the consequences of failing to provide them to Mr. Belskis in a timely fashion. Rather, the records indicate that for the first several weeks of his

incarceration, the MedPro employees did nothing to address Mr. Belskis need for diabetic shoes.

Although the Court has no guidance from the parties on the matter, it may be that the MedPro employees' lack of robust prophylactic treatment in this case reflects a broader corporate policy or custom of deferring to correctional policies even when there are severe and predictable consequences for doing so. If MedPro had a special obligation to Mr. Belskis given his potential for diabetic amputations, and yet MedPro's custom of relying on correctional policies prevented its employees from meeting this obligation, then Mr. Belskis may have a claim that MedPro's policy or custom violated his constitutional rights.

The court in *Price v. Correctional Medical Services*, 493 F. Supp. 2d 740 (D. Del. 2007), encountered a similar issue. In that case, the plaintiff brought a § 1983 action against a prison's medical contractor, alleging deliberate indifference to his serious medical needs. The plaintiff claimed that police officers permanently damaged his wrists when they handcuffed him "extremely tightly" shortly after he underwent carpal tunnel surgery on his wrists. *Id.* at 743. The plaintiff asserted that two nurses at the prison knew of his injury when he arrived at the facility but failed to provide treatment for over two weeks. *Id.* Medical specialists later confirmed that the plaintiff suffered permanent damage to his wrists. *Id.* One nurse explained her lack of care by asserting that she was following the Inmate Housing Rules for Medium High Security, which permitted emergency sick calls only if an inmate was bleeding, having a heart attack, or having difficulty breathing. *Id.* at

35

743–744.  The court denied the medical contractor's motion to dismiss because its nurses followed a policy—namely, the Inmate Housing Rules—that caused the alleged constitutional violation.  *Id.* at 746.

Here, the MedPro Defendants argue that MedPro is not liable because "the pleadings make clear that the decision [to withhold the diabetic shoes] was made not by a Medpro employee or pursuant to a Medpro policy, but done by Somerset County Jail corrections staff based on security concerns[.]"  Yet if MedPro's employees simply followed the correctional policies as a matter of custom without providing curative treatment or otherwise attempting to educate the corrections staff about the need for the shoes, then *Price* indicates that Mr. Belskis may have a valid constitutional claim against MedPro.  Rather than decide this unmentioned issue on the merits at this early stage, the Court prefers to give the parties an opportunity to fully brief the matter in the context of summary judgment.

## V.     CONCLUSION

Because Mr. Belskis states a plausible claim of deliberate indifference, the Court DENIES the MedPro Defendants' Motion to Dismiss and for Judgment on the Pleadings (ECF No. 84).

SO ORDERED.

/s/ John A. Woodcock, Jr.
JOHN A. WOODCOCK, JR.
UNITED STATES DISTRICT JUDGE

Dated this 27th day of September, 2016