UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

JOSEPH EDWARD BOVIN BELSKIS,  )
                                                      )
                      Plaintiff                       )
                                                      )
          v.                                          )        1:15-cv-00091-JAW
                                                      )
SOMERSET COUNTY, et al.,                              )
                                                      )
                      Defendants                      )

**RECOMMENDED DECISION ON COUNTY DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT**

In this action, Plaintiff Joseph Belskis alleges Defendants acted with deliberate

indifference toward his medical needs while he was incarcerated at the Somerset County

Jail.  The matter is before the Court on the County Defendants' Motion for Summary

Judgment.[1]  (ECF No. 215).

Through their motion, the County Defendants argue Plaintiff's federal claim against

them is barred because Plaintiff failed to exhaust administrative remedies available through

the Somerset County Jail grievance procedure.  (*Id.* at 2 – 4.)  In the alternative, Defendants

contend the doctrine of qualified immunity protects them from liability.   Finally,

Defendants argue that Plaintiff's claims against Somerset County and any supervisory

defendants sued in an official capacity are not actionable because Plaintiff cannot establish

---

[1] The County Defendants are comprised of Defendants David Allen (Jail Administrator, Somerset County Jail, 2012-2013), Barry DeLong (Sheriff, Somerset County, 1995-2014), Steven Giggy (Program Manager, Somerset County Jail, 2012-2013) Dale Lancaster (Chief Deputy Sheriff, Somerset County, 2012-2014, Sheriff, 2014 - ), Elijah Munn (spelled Alyah by Plaintiff) (Corrections Officer, Somerset County Jail, 2008 - ), Corey Swope (Assistant Jail Administrator, Somerset County Jail, 2007-2014, Jail Administrator, 2014 - ), and Somerset County.

the deprivation of a constitutional right or that any deprivation resulted from a municipal custom, policy, or practice, or pursuant to any decision made in a supervisory capacity. (*Id.* at 8 – 9.)  Plaintiff, who is no longer incarcerated, did not file an opposition to the motion.

Following a review of the pleadings and summary judgment filings, I recommend the Court grant in part and deny in part the motion.

### FACTS[2]

The following facts are established by the County Defendants through their summary judgment statement of material facts.  ("SMF," ECF No. 216.)

---

[2]   For purposes of summary judgment, the facts before the court ordinarily are restricted to facts introduced by the parties through their statements of material facts, which statements must be supported by citations to evidence of record.  The requirement that parties cite evidence of record is set forth both in Federal Rule of Civil Procedure 56(c) and in District of Maine Local Rule 56(b) – (d).  In addition, Local Rule 56 outlines the manner by which parties must provide the court with their factual statements and the evidence supporting the statements.  Thus, a party seeking summary judgment must file, in addition to its summary judgment motion, a supporting statement of material fact setting forth each fact in a separately numbered paragraph, followed by a citation to evidence of record that supports the factual statement.  D. Me. Loc. R. 56(b), (f).  A party opposing a motion for summary judgment must file an opposing statement of material fact that admits, denies, or qualifies the factual statements made by the moving party.  D. Me. Loc. R. 56(c).  Unless the statement is admitted, the opposing party must provide a citation to evidence of record that supports the opposing statement.  *Id.*  If a party fails to respond to a statement of material facts, the moving party's factual statements "shall be deemed admitted."  D. Me. Loc. R. 56(f).  Moreover, pursuant to Local Rule 7(b), parties are expected to file an objection to a motion if they contest the motion, and unless they do so are "deemed to have waived objection."

A court, however, "may not automatically grant a motion for summary judgment simply because the opposing party failed to comply with a local rule requiring a response within a certain number of days." *NEPSK, Inc. v. Town of Houlton,* 283 F.3d 1, 7 – 8 (1st Cir. 2002).  Instead, a court must assess whether the movant has shown "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  In particular, when a court has before it a verified complaint, the court may consider the statements contained therein when assessing whether a genuine issue of fact exists for trial.  *Clarke v. Blais*, 473 F. Supp. 2d 124, 128 (D. Me. 2007).

The facts set forth herein are derived principally from Defendants' Statement of Material Facts (ECF No. 216), but also include references to Plaintiff's verified complaint.  (ECF No. 59.)

*Plaintiff's incarceration, care and treatment*

Plaintiff was arrested in May 2012, and incarcerated at the Androscoggin County Jail. (SMF ¶ 1.)  Plaintiff was on federal probation when he was arrested. (*Id.* ¶ 2.)  During his incarceration at the Androscoggin County Jail, Plaintiff wore a pair of custom-made diabetic shoes. (*Id.* ¶¶ 3 – 4.)

On November 5, 2012, Plaintiff was transferred to the Somerset County Jail where he remained for approximately ten months. (*Id.* ¶ 5.)  He was wearing his diabetic shoes when he arrived at the Somerset County Jail. (*Id.* ¶ 6.)  During the intake process, the corrections officer on duty took custody of Plaintiff's shoes. (*Id.* ¶ 7.)  The officer informed Plaintiff that the shoes were taken for safety reasons and that he would need to raise the issue of his shoes with medical personnel. (*Id.* ¶ 8.)

According to Defendant Cory Swope, who at the time was the Assistant Jail Administrator and is now the Jail Administrator, the shoes were considered a security risk because they had metal eyelets, had laces, and were not in good condition. (*Id.* ¶ 9.)  The metal in the shoes and the laces were security concerns because they could have been used as part of a weapon or otherwise to harm others. (*Id.* ¶ 10.)  Plaintiff received a pair of canvas shoes with velcro laces. (*Id.* ¶ 11.)

On November 5, 2012, Mary Patterson, a nurse with Med Pro, met with Plaintiff for a medical screening.  During the screening, Plaintiff told Nurse Patterson he had diabetes, toe amputations, bone amputations, renal failure, diabetic shoes, appendicitis, and his first metatarsal toe was just healing. (*Id.* ¶¶ 12 – 13.)  Plaintiff spoke with Nurse Patterson about the fact he did not have his diabetic shoes. (*Id.* ¶ 14.)

When Plaintiff entered the Somerset County Jail, his feet were in the "best shape they were in except under the first metatarsal there was a red spot that looked like a healed-up wound." (*Id.* ¶ 15; Belskis Dep. at 53, ECF No. 212.)  Nurse Patterson noted the spot during the screening.  (SMF ¶ 15.) Throughout Plaintiff's incarceration at the Somerset County Jail, he received daily treatment for diabetes, which treatment included the monitoring of his blood sugar three to four times each day.  (*Id.* ¶ 16.)

On November 6, 2012, Plaintiff filed a written request with medical to have diabetic soft shoes made because his street diabetic shoes were a security risk at the facility.  (*Id.* ¶ 17.)[3]  On November 8, 2012, Lisa Cates, a supervisor with the medical staff, responded "this is not something the jail will do; you can have another pair dropped off, normally only jail-issued shoes are allowed."  (*Id.* ¶ 18; Belskis Dep. at 101.)

On December 1, 2012, Plaintiff asked to be seen by a doctor for diabetic footwear.  (SMF ¶ 19.)   On December 4, Physician Assistant Ellis met with Plaintiff.  At the conclusion of the meeting, Plaintiff understood the nursing staff would contact the correctional staff to determine whether he could have his old diabetic shoes.  (*Id.* ¶ 20.)[4]

---

[3] The County's contract medical providers filed records related to Plaintiff's care.  They filed the records in support of their answer, defenses, and affirmative defenses to the amended complaint.  The records were not introduced through an affidavit.  Among the records are the request form and other documents referenced in the County Defendants' SMF.  (ECF No. 79-6, PageID # 472.)  While neither the County Defendants nor Plaintiff has incorporated the records in a statement of material facts or proper summary judgment record, the authenticity of the records (ECF No. 79) does not appear in dispute.  Plaintiff's medical record is appended to the recent record filed by the medical providers in support of their motion for summary judgment.  (ECF No. 233.)

[4] This record is also among the documents filed by the medical providers.  (ECF No. 79-6, PageID # 476.)  The related progress note is as well.  (PageID # 474.)  It appears Ms. Cates may have issued a "keep-on-person authorization" slip to Plaintiff so that he could retain his diabetic footwear and that the authorization slip was denied by a sergeant at the jail on December 7, 2012.  (PageID # 477.)  The signature is not clear, but could be the signature of Defendant Munn.

Two days later, Plaintiff asked the medical department for an update on his diabetic footwear.  On the same day, Sarah Laplante, a registered nurse, advised Plaintiff they were looking into the issue.  The next day, Lisa Cates informed Plaintiff his request for his old diabetic shoes was denied.[5]  (*Id.* ¶ 21.)  Plaintiff did not grieve the denial.[6]  (*Id.*)  On December 8, Plaintiff asked whether the Bureau of Prisons would pay for him to obtain new shoes.  (*Id.* ¶ 22.)[7]

On December 16, 2012, Plaintiff noticed a problem with the fifth metatarsal of his right foot, and he reported his concern to Nurse Rhonda Walters.[8]  (*Id.* ¶ 23.)  On December 19, Plaintiff was issued crocs through the commissary, which was an exception to the footwear policy at the jail.[9]  (*Id.* ¶ 25.)  From December 19, 2012, through January 10,

---

[5] Plaintiff filed this written request and the responses as exhibits to his original complaint.  (ECF No. 1-1.)

[6] During his deposition, Plaintiff testified as follows:

> Q.  Did you ever grieve the denial by the sergeant to have your diabetic shoes?
>
> A.  No.

(SMF ¶ 21; Belskis Dep. at 64.)

[7] Based on the form itself, an unidentified individual referred the matter "to provider" on December 8, 2012.  (PageID # 482.)

[8] Plaintiff also filed another request to see a provider to obtain shoes on December 16, 2012.  (PageID # 489.)

[9] A memorandum dated December 18, 2012, is among the records filed by the Medical Provider Defendants.  The author is identified as Compliance Manager Maguire; the subject line reads "denial."  The memorandum states that the shoes "were denied due to metal eyelets, and long shoelaces"; that crocs were issued to replace the standard jail shoes; and that the denial was reviewed by Defendant Swope and found to meet the contraband policy.  (PageID # 492.)

2013, Plaintiff saw a member of the nursing staff every day for a dressing change to the fifth metatarsal. (*Id.* ¶ 26.)

On December 28, 2012, Plaintiff was transported to Pine Tree Orthopedic in Livermore Falls and met with Bruce MacDonald, C. Ped., for an assessment regarding his need for diabetic shoes. (*Id.* ¶ 27.)  Mr. MacDonald did not have any shoes in stock for Plaintiff and advised he would have them made. (*Id.* ¶ 29.)[10]

On January 3, 2013, Plaintiff, in a level 1 grievance, wrote that he needed to be taken to a wound care center immediately to address wounds on his right foot that developed because of the issuance of improper footwear. (*Id.* ¶ 64; see ECF No. 216-9.) He also asserted he needed an antibiotics regimen. (*Id.*)

On January 4, after seeing Nurse Laplante, Plaintiff was started on a four-day course of antibiotics. (SMF ¶ 30.)  On January 9, in response to Plaintiff's grievance, Lisa Cates wrote: "inmate is aware that he is scheduled to see wound care clinic." (ECF No. 216-9.) On January 10, Plaintiff was transported to the Wound Clinic at MaineGeneral Medical Center where he saw Dr. Lisa Sauer. (SMF ¶ 31.)

On January 14, Plaintiff completed an inmate request form on which he asked whether medical was talking to Pine Tree Orthotics about his need for orthotic shoes; whether he would receive two pairs of shoes or one; and whether he would be returned to the wound center for follow-up care. (ECF No. 1-1.)  On the top of the form Plaintiff wrote: "Medical Attn: Lisa." (*Id.*)  On January 15, Ms. Cates responded that she was

_____

[10] Mr. MacDonald recommended Plaintiff be taken to see a podiatrist or wound care specialist immediately. (PageID # 495.)

attending to the matters.  (*Id.*)  Two days later, Plaintiff returned to Mr. MacDonald to have a mold made of his feet for the diabetic shoes.  (SMF ¶ 32.)

On January 18, Plaintiff went to Redington-Fairview Hospital for an MRI.  (*Id.* ¶ 33.)[11]  On January 31, when he was taken to the Wound Center at MaineGeneral Medical Center for a follow up appointment, Dr. Sauer told him the bone was infected.  (*Id.* ¶ 34.)[12]

On February 5, Plaintiff filed a second level 1 grievance addressed at the top to "Health Care Provider." (SMF ¶ 65; see ECF Nos. 1-1, 216-10.)  When asked to describe the subject of the grievance, Plaintiff wrote:

> Health Care Provider:  this was my ongoing point to you and staff about my severity of my medical issues with my feet and the importance of having diabetic shoes from November 5, 2012 on now some 88 days later Dr. Lisa Sauer from Waterville's General Hospital tells me of my now bone infection. Don't you think that scheduling visits for [ ] antibiotics regimen and surgery of the infected bone should be done in a timely manner so there's less of a chance of more bone infection[?]  This is not an unreasonable request.

(ECF Nos. 1-1, 216-10.)

On February 7, Plaintiff saw PA Ellis who offered to provide IV antibiotics, but Plaintiff declined.  (*Id.* ¶ 35.)  Mr. Ellis evidently responded to the February 5 grievance as follows:

> Mr. Belskis was unsure as to which treatment option to choose.  I spoke with him again on 2/7/13 and he would like amputation.  This will be unresolved. We will inquire as to the custom foot wear as it has been 2 1/2 weeks since he was fitted.

---

[11] The report of examination is among the provider documents.  (PageID # 505.)

[12] In his verified amended complaint, Plaintiff asserts he "made another in a series of written administrative requests for wound care for the existing wounds."  (Am. Compl. ¶ 31.)  He does not state that he directed this request to the County Defendants.

(*Id.*)

On February 14, Plaintiff wrote his final grievance on a "Level 2 Grievance" form. At the top of the form, he again wrote "Health Care Provider."

> My medical issues have been documented; I have followed protocol.   I have been patient all the while my condition worsens, jeopardizing my livelihood.   I need to see the surgeon as to have my toe amputated before the bone infection spreads and my leg is endangered.  I'm filing this level two grievance to document the seriousness of the matter.

(ECF No. 1-1, PageID # 33; ECF No. 216-5.)  The record does not include a response to the grievance.

On February 15, Plaintiff was taken to Central Maine Orthotics for evaluation for amputation.  (*Id.* ¶ 36.)[13]  Four days later, Plaintiff received his new diabetic shoes.  (*Id.* ¶ 37.)  In March 2013, Plaintiff underwent surgery in which his right little toe was amputated. (*Id.* ¶ 38.)[14]

### Information Plaintiff provided to jail staff

Plaintiff told jail staff (i.e., county corrections staff and not the medical provider staff) he had diabetes and had diabetic shoes from another jail that he needed, but he did not discuss the purpose for the diabetic shoes.[15]  (SMF ¶ 39.)  In his verified amended complaint, Plaintiff asserts that "various different officers accompanied him or provided transportation" when he obtained outside medical care, and that the officers "were present

---

[13] The report is available in the record.  (PageID # 512.)

[14] The associated operative note is dated March 11, 2013.  (PageID # 527.)

[15] The cited deposition testimony identifies Corrections Officer Davis as the person Plaintiff informed. (Belskis Dep. at 118.)

during the medical examinations and procedures and privy to the instructions given to the Plaintiff to address the reasons for the medical visit." (Am. Compl. ¶ 53, ECF No. 59.) Plaintiff alleges that each officer "was in a position to provide notice to supervisors or superiors at Somerset and each is a witness to these events." (*Id.*)

*Information MedPro provided to jail staff* [16]

Although Plaintiff's fact presentation related to the County Defendant's knowledge of his condition is quite limited, the Medical Defendants[17] filed a separate motion for summary judgment, and in support of the motion asserted they informed certain County Defendants of Plaintiff's medical condition and of his need for specialized footwear. (See Statement of Material Fact in Support of Motion for Summary Judgment by MedPro Defendants ¶¶ 40, 41, 44, 66, 67, ECF No. 233.) According to the Medical Defendants, they informed Sergeant Theresa Brown, Sergeant Elijah Munn, Compliance Officer Sean Maguire, and Jail Administrator David Allen of Plaintiff's need for diabetic shoes and that denial of the shoes could result in "potential medical complications" and "could lead to problems with his feet." (*Id.*) One of the medical care providers submitted a "keep on person" authorization for Plaintiff's diabetic shoes, but the authorization was denied when it was submitted to the jail. (*Id.* ¶¶ 12, 13.)

---

[16] Although the statements provided by the MedPro employees are not technically part of the Local Rule 56 record on the County Defendants' summary judgment motion, the Court is not required to ignore record material of which it is aware. *Ricci v. Applebee's Ne., Inc.*, 297 F. Supp. 2d 311, 321 (D. Me. 2003).

[17] The Medical Defendants consist of DT Developers, Robert Ellis, Trina Littlefield, Mary Patterson, Lisa Cates, and Rhonda Walters.

*Somerset County Policies*

Somerset County Jail Policies 12.1 entitled "Health Care Management" (ECF No. 216-7) and 12.2 entitled "Health Care-Screening and Services" (ECF No. 216-8) are the official policies of the Somerset County Jail and were in effect at all relevant times.  (SMF ¶ 51.)  Policy 12.1 provides that "[n]o non-medical staff member will deny an inmate access to treatment or evaluation of medical or mental health problems."  (*Id.* ¶ 52; Policy 12.1 at 1.)  It further states: "All matters of medical judgment are the sole province of the physicians or dentists working for, or under contract with, the Somerset County Jail, however, the unified Health Authority has the final clinical authority in all cases."  (SMF ¶ 53; Policy 12.1 at 3, § B.1.)  "Medical staff members are obligated to be aware of inmates with special medical problems that may require specific interventions and the associated signs and symptoms."  (SMF ¶ 54; Policy 12.1 at 3, § B.8.)

Policy 12.2 provides in relevant part:

> At least one licensed nurse is on duty at the institution during normal business hours.  A physician or physician's assistant will be on duty at the SCJ during normal Sick Call hours.  Prescription medications are administered by health care staff during three scheduled periods.  At least one member of the health care staff members is on-call during all non-business hours thereby providing 24-hour coverage seven (7) days a week.

(SMF ¶ 55; Policy 12.2 at 3, § A.3.)  Somerset County contracts with MedPro Associates to provide medical services for Somerset County Jail inmates.  (SMF ¶ 56.)  Diagnostic and treatment decisions for inmates are the responsibility of the Somerset County Jail's medical provider.  (*Id.* ¶ 57.)

*Plaintiff's Grievances*

The grievance policy is outlined in the Somerset County Jail Inmate Handbook, which is provided to all inmates upon entry to the Somerset County Jail, and was provided to Plaintiff.  (*Id.* ¶ 63.)  According to the grievance policy, an inmate can file a grievance for an alleged violation of civil, constitutional, or statutory rights; for an alleged criminal or prohibited act by a staff member; for a condition within the facility that creates unsafe or unsanitary living conditions; and for a chronic condition within the facility that contradicts the Detention and Correctional Standards for Maine Counties and Municipalities.  (*Id.* ¶ 58.)

The first step in the grievance procedure is a level 1 grievance.  (*Id.* ¶ 59.)  If the inmate is not satisfied with the response to a level 1 grievance, the inmate may file a level 2 grievance.  (*Id.* ¶ 60.)  As a final step, the inmate may file a grievance with the Maine Department of Corrections.  (*Id.* ¶ 61.)

Plaintiff filed three grievances regarding his shoes.  He filed a level 1 grievance on January 3, 2013 (*Id.* ¶ 64; see ECF No. 216-9), a level 1 grievance dated February 5, 2013 (SMF ¶ 65; see ECF No. 216-10), and a level 2 grievance related to his foot on February 14, 2013.  (SMF ¶ 66; see ECF No. 216-11.)  Plaintiff did not receive a response to his level 2 grievance.  (Belskis Dep. at 132.)  Plaintiff did not write to the Maine Department of Corrections regarding any of the grievances.  (SMF ¶ 67.)[18]

---

[18] All of Defendants' statements concerning the grievance policy are supported by the affidavit of Defendant Swope.  Defendants have not introduced the actual policy.  With respect to the availability of relief from the Department following a level 2 grievance, Defendant Swope states the following:  "If an inmate is still

SUMMARY JUDGMENT STANDARD

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "After the moving party has presented evidence in support of its motion for summary judgment, 'the burden shifts to the nonmoving party, with respect to each issue on which he has the burden of proof, to demonstrate that a trier of fact reasonably could find in his favor.'"  *Woodward v. Emulex Corp.*, 714 F.3d 632, 637 (1st Cir. 2013) (quoting *Hodgens v. Gen. Dynamics Corp.*, 144 F.3d 151, 158 (1st Cir. 1998)).

A court reviews the factual record in the light most favorable to the non-moving party, resolving evidentiary conflicts and drawing reasonable inferences in the non-movant's favor.  *Perry v. Roy,* 782 F.3d 73, 77 (1st Cir. 2015).  If a court's review of the record reveals evidence sufficient to support findings in favor of the non-moving party on one or more of his claims, a trial-worthy controversy exists and summary judgment must be denied as to any supported claim.  *Id.* ("The district court's role is limited to assessing whether there exists evidence such that a reasonable jury could return a verdict for the nonmoving party." (internal quotation marks omitted)).  Unsupported claims are properly dismissed.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 – 24 (1986) ("One of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses.").

---

not satisfied, after receiving a response to a Level 2 grievance, the inmate may file a grievance with the Maine Department of Corrections."  (Swope Aff. ¶ 16, ECF No. 216-6.)

DISCUSSION

In his amended complaint, Plaintiff alleges that Defendants, both the County Defendants and the Medical Defendants, "implemented policies to provide the minimal amount of medical services to inmates, and whenever possible to deny medical treatment to inmates through delay and obfuscation."  (Am. Compl. at 2.)  Plaintiff contends the County Defendants are liable based on the policy; he asserts claims against the individual defendants in both their official and personal capacities.  (*Id.* at 17 – 19, 22 – 24.)  As part of his claim, Plaintiff asserts Defendants did not permit him to retain his diabetic shoes, and did not issue him appropriate footwear.  (*Id.* at 7-8.)

Through their motion for summary judgment, the County Defendants argue Plaintiff did not exhaust his administrative remedies because he did not pursue any of the grievances to conclusion.   Additionally, the County Defendants contend summary judgment is warranted because the record lacks any evidence that they were on notice of the seriousness of Plaintiff's medical condition, or that the care rendered by the medical provider was inappropriate.   The individual County Defendants also argue they are immune from liability because "[i]t was not clearly established that [Plaintiff] was entitled to additional medical care above what he was offered under the circumstances."  (*Id.* at 7, 9 – 10.)  The County and the individual defendants in their official capacities further maintain the County policies were constitutional.  (*Id.* at 8.)

**A.     Failure to Exhaust**

Federal law requires a prisoner to exhaust the available administrative remedies before initiating a lawsuit based on 42 U.S.C. § 1983.  Specifically, "[n]o action shall be

13

brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a); *see also Jones v. Bock*, 549 U.S. 199, 211 (2007) ("There is no question that exhaustion is mandatory under the PLRA [Prison Litigation Reform Act] and that unexhausted claims cannot be brought in court.") "'Prison conditions' under [the PLRA] include individual instances of medical mis-or non-treatment." *Acosta v. United States Marshals Service*, 445 F.2d 509, 512 (1st Cir. 2006).

The Supreme Court has held that § 1997e(a) requires "proper exhaustion" of a prisoner's administrative remedies. *Woodford v. Ngo*, 548 U.S. 81, 93 (2006). "Proper exhaustion demands compliance with an agency's deadlines and other critical procedural rules because no adjudicative system can function effectively without imposing some orderly structure on the course of its proceedings." *Id.* at 90 − 91. "Compliance with prison grievance procedures … is all that is required … to 'properly exhaust.'" *Jones*, 549 U.S. at 218. "[I]t is the prison's requirements, and not the PLRA, that define the boundaries of proper exhaustion." *Id.*

A defendant may raise the § 1997e exhaustion requirement as an affirmative defense. *Jones v. Bock*, 549 U.S. 199, 216 (2007); *see also Ramos v. Patnaude*, 640 F.3d 485, 488 (1st Cir. 2011) ("The Supreme Court made it plain … that exhaustion under § 1997e(a) is not a jurisdictional condition, and has held it to be an affirmative defense." (citing *Jones,* 549 U.S. at 212)). Because failure to exhaust administrative remedies is an affirmative defense rather than a jurisdictional issue, initially, Defendants bear the burden

of proof. *Jones*, 549 U.S. at 216. To satisfy that burden, Defendants must establish "that there was an available administrative remedy, and that the prisoner did not exhaust that available remedy." *Albino v. Baca,* 747 F.3d 1162, 1172 (9th Cir.) (en banc), *cert. denied sub nom.*, *Scott v. Albino,* 135 S. Ct. 403 (2014). Thereafter, Plaintiff must present evidence that demonstrates "that there is something in his particular case that made the existing and generally available administrative remedies effectively unavailable to him." *Id.*

The record establishes Plaintiff filed level 1 grievances and a level 2 grievance regarding the medical treatment of his foot, including his request for his diabetic shoes or more appropriate footwear. Defendants maintain Plaintiff failed to pursue his grievance to the third administrative level, a letter of appeal to the Department of Corrections. Defendants rely on Plaintiff's deposition testimony to establish that Plaintiff did not write a letter to the Department. (SMF ¶ 67.)

The issue is whether Plaintiff exhausted all available administrative remedies. Concerning the availability of the final level of administrative review (i.e., the letter to the Department of Corrections), Defendant Swope, upon whom Defendants rely to establish the terms of the grievance policy,[19] asserts: "If an inmate is still not satisfied, *after receiving a response* to a Level 2 grievance, the inmate may file a grievance with the Maine Department of Corrections." (Swope Aff. ¶ 16, ECF No. 216-6) (emphasis supplied.)

---

[19] Defendants did not file a copy of the grievance policy. According to the Second Circuit, "defendants bear the initial burden of establishing, by pointing to legally sufficient sources such as statutes, regulations, or grievance procedures, that a grievance process exists and applies to the underlying dispute." *Hubbs v. Suffolk Cty. Sheriff's Dep't*, 788 F.3d 54, 59 (2d Cir. 2015) (quotation marks and brackets omitted).

According to Plaintiff, he did not receive a response to the level 2 grievance. In fact, the record lacks any evidence that Plaintiff received a response to the level 2 grievance. Based on the current record, therefore, a question remains as to whether the final level of review was available to Plaintiff.[20]  Accordingly, summary judgment based on Plaintiff's alleged failure to exhaust the available administrative remedies is not warranted.[21]

## B.   Deliberate Indifference

Defendants' obligation to Plaintiff regarding medical services is governed by the Due Process Clause of the Fourteenth Amendment. Specifically, the Due Process Clause imposes on the states the "substantive obligation" not to treat prisoners in their care in a

---

[20] To be an available remedy, a grievance procedure must actually apply to the type of claim at issue. *Bean v. Barnhart*, No. 1:13-cv-00196-NT, 2015 WL 3935777, at *5 (D. Me. June 26, 2015) (citing *Booth v. Churner*, 532 U.S. 731, 736 n.4 (2001), and *Malik v. D.C.*, 574 F.3d 781, 785 (D.C. Cir. 2009)). *See also Davis v. Fernandez*, 798 F.3d 290, 294 – 95 (5th Cir. 2015) ("when defendants claim a failure to exhaust, they have the burden to prove that the plaintiff did not exhaust administrative remedies that were actually available to him."). In another case involving Somerset County policy, the Court has found that grievances regarding medical care are subject to a two-level grievance procedure. *Goodwin v. Medpro Assocs.*, No. 1:12-CV-00371-JCN, 2014 WL 4437546, at *4 (D. Me. Sept. 9, 2014).

[21] Plaintiff must exhaust all "available" remedies. *Johnson v. Thyng*, 369 Fed. App'x 144, 147 (1st Cir. 2010) ("The emerging case law rejects [the] theory that an optional level of administrative review need not be exhausted for purposes of PLRA."). The Seventh Circuit has recognized an exception to the exhaustion requirement where the administrative board failed to respond to the prisoner's grievance. *Lewis v. Washington*, 300 F.3d 829 (7th Cir. 2002). However, the failure of jail administrators to respond may require the prisoner to pursue further administrative remedies, at least where the policy in question authorizes a further administrative remedy in the absence of a response to a preliminary grievance. *Cowart v. Erwin*, 837 F.3d 444, 452 (5th Cir. 2016) (rejecting failure to exhaust argument where policy provided for an appeal only following the return of unsatisfactory findings). In particular, when the policy states that further remedies are available in the absence of a response, courts have imposed the requirement that those remedies be attempted before filing in court. *Richardson v. N.Y. State Dep't of Corr. & Cmty. Supervision Emp.*, 633 F. App'x 816, 818 (2d Cir. 2016). However, "when a prison's procedures prescribe deadlines by which the authorities must respond to grievances and do not set out any additional steps that prisoners must take upon that time elapsing, then prisoners in such circumstances have exhausted the available procedures." *Cantwell v. Sterling*, 788 F.3d 507, 509 n.2 (5th Cir. 2015). *See also Smith v. St. Tammany Par. Sheriff's Office*, No. 2:07-CV-03525, 2008 WL 3010038, at *3 & n.11, 2008 U.S. Dist. LEXIS 58402, at *9 – 10 & n.11 (E.D. La. Aug. 1, 2008) (non-timely response by jail administrators does not relieve prisoner of obligation to exhaust the next level of the administrative process, involving procedure that instructed prisoners to file the next level grievance if they did not receive a response to their lower-level grievance within a set timeframe).

16

manner that reflects "deliberate indifference" toward "a substantial risk of serious harm to health," *Coscia v. Town of Pembroke*, 659 F.3d 37, 39 (1st Cir. 2011), or "serious medical needs," *Feeney v. Corr. Med. Servs.*, 464 F.3d 158, 161 (1st Cir. 2006) (quoting *Estelle v. Gamble*, 429 U.S. 97, 105 – 106 (1976)).  To be actionable, a deliberate indifference claim must satisfy both an objective and a subjective standard.  *Leavitt v. Corr. Med. Servs.*, 645 F.3d 484, 497 (1st Cir. 2011).

The objective standard evaluates the seriousness of the risk of harm to one's health. For a medical condition to be objectively "serious," there must be "a sufficiently substantial 'risk of serious damage to [the inmate's] future health.'"  *Farmer v. Brennan*, 511 U.S. 825, 843 (1994) (quoting *Helling v. McKinney*, 509 U.S. 25, 35 (1993)).  A medical need is serious if it has been diagnosed by a physician as mandating treatment, or is so obvious that even a lay person would recognize a need for medical intervention.  *Leavitt*, 645 F.3d at 497; *Gaudreault v. Mun. of Salem*, 923 F.2d 203, 208 (1st Cir. 1990), *cert. denied*, 500 U.S. 956 (1991).

The subjective standard concerns the culpability of the defendant.  There must be evidence that a particular defendant possessed a culpable state of mind amounting to "deliberate indifference to an inmate's health or safety."  *Farmer*, 511 U.S. at 834 (internal quotation marks omitted).  Deliberate indifference is akin to criminal recklessness, "requiring actual knowledge of impending harm, easily preventable."  *Feeney*, 464 F.3d at 162 (quoting *Watson v. Caton*, 984 F.2d 537, 540 (1st Cir. 1993)).  The focus of the deliberate indifference analysis "is on what the jailers knew and what they did in response." *Burrell v. Hampshire Cnty.*, 307 F.3d 1, 8 (1st Cir. 2002).

Deliberate indifference must be distinguished from negligence.  As the First Circuit explained:

> A finding of deliberate indifference requires more than a showing of negligence.  *Estelle v. Gamble*, 429 U.S. 97, 106 (1976) (holding that "[m]edical malpractice does not become a constitutional violation merely because the victim is a prisoner"); *Sires v. Berman*, 834 F.2d 9, 13 (1st Cir. 1987).  A plaintiff claiming an eighth amendment violation with respect to an inmate's serious mental health or safety needs must allege "acts or omissions sufficiently harmful to evidence deliberate indifference."  *Estelle*, 429 U.S. at 106; *see also Cortes-Quinone v. Jimenez-Nettleship*, 842 F.2d 556, 558 (1st Cir.), *cert. denied*, 488 U.S. 823 (1988).  Although this court has hesitated to find deliberate indifference to a serious need "[w]here the dispute concerns not the absence of help, but the choice of a certain course of treatment," *Sires*, 834 F.2d at 13, deliberate indifference may be found where the attention received is "so clearly inadequate as to amount to a refusal to provide essential care."

*Torraco v. Maloney*, 923 F.2d 231, 234 (1st Cir. 1991).

Defendants argue the record will not support the necessary finding that they had sufficient knowledge to act with deliberate indifference toward a serious medical need because they did not understand that Plaintiff could develop wounds that would require amputation and they relied on the medical providers to care for Plaintiff's condition. Defendants assert the medical providers regularly attended to Plaintiff and thus they had no reason to believe the care Plaintiff received was constitutionally inadequate.  Plaintiff asserts claims against the individual County Defendants in their personal and official capacities, and he asserts a municipal liability claim against Somerset County.

### 1.      Personal-capacity claims

Defendants argue the evidence does not satisfy the subjective component of the deliberate indifference standard.  Alternatively, they argue they have qualified immunity

because reasonable individuals in their position would not have understood their conduct would deprive Plaintiff of a constitutional right.

To the extent Plaintiff asserts a § 1983 claim against an individual defendant, Plaintiff must introduce evidence to support a finding that the individual, through his or her individual actions, violated Plaintiff's constitutional rights. *Ashcroft v. Iqbal,* 556 U.S. 662, 676 – 77 (2009).[22] The subjective component of the deliberate indifference claim requires a showing that a defendant had "actual knowledge of impending harm, easily preventable." *Feeney*, 464 F.3d at 162.

The record evidence before the Court, when viewed most favorably to Plaintiff, establishes that Plaintiff complained in three grievances about the quality of his medical care (SMF, Exhs. 3 – 5); in one grievance, Plaintiff wrote that his condition required immediate attention because of the "potential for amputation" (SMF, Exh. 3.); one of the medical care providers submitted a "keep on person" authorization for Plaintiff's diabetic shoes, but the authorization was denied when it was submitted to the jail; and certain Medical Defendants informed County personnel on multiple occasions of the need for Plaintiff to have specialized footwear yet the County did not return to Plaintiff the diabetic shoes he wore when he entered the jail. At a minimum, the record generates an issue of fact as to whether certain County Defendants (specifically then Jail Administrator Allen,

---

[22] Plaintiff's federal claim under § 1983 and his state claim under the Maine Civil Rights Act are subject to the same merits-based analysis, including any qualified immunity analysis. *Clifford v. MaineGeneral Med. Ctr.*, 2014 ME 60, 91 A.3d 567, 583 n.17. *See also Jackson v. Town of Waldoboro,* 751 F. Supp. 2d 263, 275 (D.Me. 2010) ("The MCRA, which provides a general remedy for violations of federal and state constitutional and statutory rights, is 'patterned' after Section 1983. As such, disposition of a claim under Section 1983 controls a claim brought under MCRA.") (citation omitted).

then Assistant Jail Administrator Swope, and Sergeant Munn) had "actual knowledge of impending harm, easily preventable." *Feeney*, 464 F.3d at 162 (quoting *Watson*, 984 F.2d at 540). The record, however, lacks any evidence to support a finding that Defendant Delong, Defendant Lancaster, or Defendant Giggy, individually or in a supervisory capacity, was involved in the care Plaintiff received at the Somerset County Jail.[23]

As to Defendants' alternative argument for application of the qualified immunity doctrine, because a genuine issue of fact exists regarding some of the County Defendants' knowledge and conduct, the same facts would raise a genuine issue whether a reasonable officer in their position would have appreciated that such acts or omissions violated clearly established law. *Miranda-Rivera v. Toledo-Davila*, 813 F.3d 64, 75 (1st Cir. 2016). *See also Martin v. Somerset Cty.*, 387 F. Supp. 2d 65, 79-80 (D. Me. 2005) ("Once a plaintiff creates a genuine dispute of material fact that a defendant was subjectively deliberately indifferent, then the defendant cannot be entitled to qualified immunity on the grounds that a reasonable officer in his or her position would not understand that such conduct violated the plaintiff's rights." (citation omitted)).

---

[23] Supervisory officials are legally responsible for constitutional violations committed by a subordinate if the subordinate's behavior resulted in a constitutional violation, and the supervisor's own action or inaction can be affirmatively linked to the subordinate's conduct through record evidence, which could include evidence of "'supervisory encouragement, condonation or acquiescence or gross negligence amounting to deliberate indifference.'" *Estate of Bennett v. Wainwright*, 548 F.3d 155, 176-77 (1st Cir. 2008) (quoting *Pineda v. Toomey*, 533 F.3d 50, 54 (1st Cir. 2008)); *Norton v. City of S. Portland*, 831 F. Supp. 2d 340, 365 (D. Me. 2011). With respect to Defendant Delong (Sheriff) and Defendant Lancaster (Deputy Sheriff), who might have supervisory authority over jail administration, the summary judgment record does not contain evidence that could establish a link between them and the alleged constitutional deprivation.

## 2. Official-capacity claims

An official capacity claim "generally represent[s] only another way of pleading an action against an entity of which an officer is an agent." *Monell v. Dep't of Soc. Servs. of N.Y.,* 436 U.S. 658, 690 n. 55 (1978). Thus, "an official-capacity suit is, in all respects other than name, to be treated as a suit against the entity." *Kentucky v. Graham,* 473 U.S. 159, 166 (1985). Here, Plaintiff has named the entity, Somerset County, in addition to the officers in question. Plaintiff's official capacity claims and his claim against the County are, in effect the same claim. *Cote v. Town of Millinocket*, 901 F. Supp. 2d 200, 234 (D. Me. 2012); *Trafford v. City of Westbrook*, 256 F.R.D. 31, 33 (D. Me. 2009).

A municipality cannot be vicariously liable for a constitutional deprivation simply because the deprivation was caused by a municipal employee. *Welch v. Ciampa,* 542 F.3d 927, 941 (1st Cir.2008) (citing *Monell v. Dep't of Soc. Servs.,* 436 U.S. 658, 691 (1978)). For a municipality to be liable for a constitutional deprivation, the record must include evidence that a municipal policy, custom, or practice caused the deprivation. *Id.* The applicable standard requires a plaintiff to "identify a municipal 'policy' or 'custom' that caused the plaintiff's injury." *Bd. of the Cnty. Comm'rs v. Brown,* 520 U.S. 397, 403 (1997).

Here, the record contains sufficient facts to support a claim based on a policy of the County. More specifically, a factfinder could conclude Plaintiff was deprived of his

diabetic shoes and thus denied the required care because of the County's contraband policy as applied to Plaintiff's diabetic shoes.[24]

## CONCLUSION

Based on the foregoing analysis, I recommend the Court grant in part and deny in part the County Defendants' Motion for Summary Judgment.   (ECF No. 215.)   In particular, I recommend the Court dismiss Plaintiff's claim against Defendants Delong, Lancaster, and Giggy, and otherwise deny the motion.

## NOTICE

A party may file objections to those specified portions of a magistrate judge's report or proposed findings or recommended decisions entered pursuant to 28 U.S.C. § 636(b)(1)(B) for which *de novo* review by the district court is sought, together with a supporting memorandum, within fourteen (14) days of being served with a copy thereof. A responsive memorandum and shall be filed within fourteen (14) days after the filing of the objection.

Failure to file a timely objection shall constitute a waiver of the right to *de novo* review by the district court and to appeal the district court's order.

/s/ John C. Nivison
U.S. Magistrate Judge

Dated this 2nd day of March, 2017.

---

[24] Plaintiff's claim against the County is also informed by the conduct of the Medical Defendants' alleged deprivation of Plaintiff's constitutional rights. *See*, *e.g.*, *Ancata v. Prison Health Servs., Inc.*, 769 F.2d 700, 705 (11th Cir.1985) ("The federal courts have consistently ruled that governments, state and local, have an obligation to provide medical care to incarcerated individuals.") (holding that the duty to provide medical is not discharged by contracting out medical care).