UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

JOSEPH EDWARD BOVIN          )
BELSKIS,                     )
                             )
          Plaintiff,         )
                             )
     v.                      )          1:15-cv-00091-JAW
                             )
SOMERSET COUNTY, et al.,     )
                             )
          Defendants.        )

## ORDER ON MEDPRO DEFENDANTS' MOTION
## FOR SUMMARY JUDGMENT

The plaintiff in this civil rights action under 42 U.S.C. § 1983 alleges that the medical provider at a county jail acted with deliberate indifference in providing care that ultimately resulted in the amputation of one of his toes. The Court concludes that the plaintiff has withstood summary judgment because the record contains no evidence as to the extent to which the defendant advocated on behalf of the plaintiff with jail officials who were denying recommended care.

## I.     BACKGROUND

### A.     Procedural History

On March 6, 2015, Joseph Edward Bovin Belskis filed a complaint in this Court against various federal, county, and individual actors, including a medical contracting business and several of its employees, alleging that they violated his civil rights while he was a federal prisoner housed at the Somerset County Jail (SCJ).

*Compl.* (ECF No. 1).[1]  Mr. Belskis amended his complaint on October 14, 2015.  *First Am. Compl.* (ECF No. 59) (*Am. Compl.*).  Mr. Belskis began this legal action acting pro se; however, once he survived a motion to dismiss and motion for judgment on the pleadings and faced motions for summary judgment, the Court asked Attorney Jon Haddow to represent Mr. Belskis and on March 31, 2016, Attorney Haddow entered his appearance on Mr. Belskis' behalf.  *Notice of Appearance* (ECF No. 253).

On January 13, 2017, the so-called Medpro Defendants filed a motion for summary judgment, *Mot. for Summ. J. by Medpro Defs.* (ECF No. 232) (*Medpro Mot.*), together with a statement of uncontested material facts.  *Statement of Material Fact in Support of Mot. for Summ. J. by Medpro Defs.* (ECF No. 233) (DSMF).  Mr. Belskis, who at the time was not represented by counsel, failed to respond.

On May 2, 2017, Attorney Haddow filed a consent motion to extend the time for Mr. Belskis' response to the Medpro Defendants' motion for summary judgment to May 23, 2017 and on May 2, 2017, the Court granted the motion.  *Pl.'s Mot. to Extend Deadline to Resp. to Medpro Defs' Mot. for Summ. J.* (ECF No. 259); *Order Granting Mot. to Extend Time* (ECF No. 263).  On May 23, 2017, Mr. Belskis, through Attorney Haddow, filed another motion to extend time to June 1, 2017, which the Court granted on May 23, 2017.  *Pl.'s Mot. to Extend Deadline to Resp. to Medpro Defs.' Mot. for Summ. J.* (ECF No. 268); *Order Granting Mot. to Extend Time* (ECF No. 271).  On June 1, 2017, Mr. Belskis filed what was termed a final motion to extend

---

[1]     The complete procedural backdrop is complicated but not material to this Order.  On September 27, 2016, the Court more fully described the background at least until that date.  *See Order on Mot. to Dismiss and Mot. for J. on the Pleadings* at 2-3 (ECF No. 184).

time, this time to June 16, 2017. *Pl.'s Final Mot. to Extend Deadline to Resp. to Medpro Defs.' Mot. for Summ. J.* (ECF No. 270). On June 1, 2017, the Court granted this final extension. *Order Granting Mot. to Extend Time* (ECF No. 271).

On June 16, 2017, Mr. Belskis responded to the Medpro Defendants' motion for summary judgment, *Pl.'s Mem. in Opp'n to Medpro Defs.' Mot. for Summ. J.* (ECF No. 272) (*Pl.'s Opp'n*), and filed a responsive statement of undisputed material facts, *Pl.'s Resp. to Medpro Defs.' Statement of Material Fact* (ECF No. 273) (PRDSMF) as well as a statement of additional material facts. *Id.* Attach. 1, *Pl.'s Statement of Additional Material Facts in Opp'n to Mot. for Summ. J.* (ECF No. 273) (PSAMF). On July 6, 2017, the Medpro Defendants filed a reply to Mr. Belski's response to their motion for summary judgment, *Reply to Pl.'s Opp'n to the Mot. for Summ. [J.] by Medpro Defs.* (ECF No. 277) (*Medpro Reply*) and a response to Mr. Belskis' additional statement of material fact. *Medpro Defs.' Resp. to Pl.'s Additional Facts* (ECF No. 275) (DRPSAMF).

## B.     Joseph Belskis' Amended Complaint

Mr. Belskis has brought this civil rights action against Medpro under 42 U.S.C. § 1983 and under 5 M.R.S. §§ 4651, *et seq. Am. Compl.* at 1.[2] In the October 14, 2015 Amended Complaint, Mr. Belskis claims that Medpro created policies, practices and customs that affected the delivery of medical care, treatment, and services and that violated his constitutional rights. *Id.* at 22. He also alleges that Medpro violated his

---

[2]     Mr. Belskis initially stated medical negligence claims against Medpro; however, on July 27, 2015, Mr. Belskis filed a notice dismissing all such claims against Medpro. *Notice of Voluntary Dismissal* (ECF No. 41).

Eighth Amendment guarantee against cruel and abusive treatment and his Fourteenth Amendment right to due process of law. *Id.* at 22-23.

## II.    THE STATEMENT OF FACTS[3]

### A.    Joseph Belskis and Diabetes

Joseph Belskis is a diabetic with a history of lower extremity ischemic vascular disease including two prior toe amputations and a history of diabetic foot ulcers. DSMF ¶ 4; PRDSMF ¶ 4. Mr. Belskis arrived at the Somerset County Jail (SCJ) with a history of poorly controlled diabetes, peripheral vascular disease, and previous amputations of the left and right great toes. *Id.* He also had a history of substance abuse. *Id.* One of the foundations for the care of diabetes and prevention of the risks of development of other conditions is the close monitoring of the hemoglobin HgB AIC level. DSMF ¶ 28; PRDSMF ¶ 28.

### B.    Joseph Belskis, Diabetic Footwear, the Androscoggin County Jail, and the Transfer to the Somerset County Jail

Joseph Belskis was arrested in May 2012 and incarcerated at the Androscoggin County Jail (ACJ). PSAMF ¶ 1; DRPSAMF ¶ 1. Mr. Belskis was on federal probation when he was arrested. PSAMF ¶ 2; DRPSAMF ¶ 2. During his incarceration at the ACJ, Mr. Belskis was allowed to wear a pair of diabetic shoes that he had made in 2011. PSAMF ¶ 3; DRPSAMF ¶ 3. These shoes were a brown leather type diabetic

---

[3]    In accordance with "conventional summary judgment praxis," the Court recounts the facts in the light most favorable to Mr. Belskis' theory of the case consistent with record support. *Gillen v. Fallon Ambulance Serv., Inc.*, 283 F.3d 11, 17 (1st Cir. 2002). Consistent with this obligation, the Court recites certain events as facts even though MedPro disputes them.

4

shoe with expanding laces like a rubber band with metal eyelets, similar to a hiking shoe.  PSAMF ¶ 4; DRPSAMF ¶ 4.

### C.  The Somerset County Jail Booking Process

On November 5, 2012, Mr. Belskis was transferred to the SCJ, where he remained for approximately ten months.  PSAMF ¶ 5; DRPSAMF ¶ 5.  Specifically, the SCJ received Mr. Belskis on November 5, 2012 and transferred him on August 30, 2013.  DSMF ¶ 1; PRDSMF ¶ 1.  Mr. Belskis was transferred from ACJ to SCJ as a federal prisoner and was being held at the SCJ as a federal prisoner on behalf of the United States Marshal Service in connection with criminal charges pending against him in United States District Court for the District of Maine.  DSMF ¶ 3; PRDSMF ¶ 3.

When Mr. Belskis was transferred from the ACJ to SCJ, he was wearing his diabetic shoes.  PSAMF ¶ 6; DRPSAMF ¶ 6.  SCJ correctional staff denied Mr. Belskis the use of his diabetic shoes on his entry into the jail as part of the initial booking process, DSMF ¶ 5; PRDSMF ¶ 6, and upon entry to the sally port, the corrections officer took Mr. Belskis' diabetic shoes on intake.  PSAMF ¶ 7; DRPSAMF ¶ 7.  Mr. Belskis told the corrections office staff who were booking him into the SCJ that he needed his diabetic shoes and he would have a problem if he could not wear them.  DSMF ¶ 6; PRDSMF ¶ 6.  The corrections officers told Mr. Belskis that they were taking his shoes for safety reasons and that his shoes were not allowed through the door.  PSAMF ¶ 8; DRPSAMF ¶ 8.  At booking, the corrections officers gave Mr. Belskis canvas shoes with Velcro laces.  PSAMF ¶ 9; DRPSAMF ¶ 9.  After the initial

denial by SCJ, Medpro staff members made three separate requests of SCJ staff to obtain Mr. Belskis' diabetic shoes, which his previous jail, ACJ, had permitted, and were denied on all three occasions by SCJ correctional staff, including Jail Administrator David Allen.  DSMF ¶ 7; PRDSMF ¶ 7.

### D.    Medpro's Initial Dealings with Joseph Belskis

During the booking, the corrections officers told Mr. Belskis that he needed to address the issue of his diabetic shoes with the medical staff.  PSAMF ¶ 8; DRPSAMF ¶ 8.  Medpro is a wholly-owned subsidiary of DT Developers, Inc. which does business as Medpro Associates and serves as the medical provider at SCJ.  PSAMF ¶ 2; DRPSAMF ¶ 2.  On November 5, 2012, Mary Patterson, a nurse with Medpro, saw Mr. Belskis.  PSAMF ¶ 10; DRPSAMF ¶ 10; DSMF ¶ 8; PRDSMF ¶ 8.  Nurse Patterson executed a "medical intake questionnaire" form concerning her examination and determined that Mr. Belskis was medically and mentally stable at the time.  DSMF ¶ 8; PRDSMF ¶ 8.  During the medical screening, Mr. Belskis told Nurse Patterson that he had diabetes, toe amputations, bone amputations, renal failure, diabetic shoes, appendicitis, and that his first metatarsal toes was just healing.  PSAMF ¶ 11; DRPSAMF ¶ 11.  Mr. Belskis also mentioned that the corrections staff had denied him diabetic shoes.  PSAMF ¶ 12; DRPSAMF ¶ 12.

When Mr. Belskis was transferred to the SCJ, his feet were in good shape, except there was a red spot under the first metatarsal that looked like a healed-up wound.  PSAMF ¶ 13; DRPSAMF ¶ 13.  Nurse Patterson noted a light dime-sized spot on Mr. Belskis right great toe area and a pink area on the metatarsal area.

DSMF ¶ 10; PRDSMF ¶ 10.  She questioned whether the provider should review the matter but did not place Mr. Belskis on the sick call book to be seen by the provider. *Id.*  Nurse Patterson's observations were of a previous wound that had completely healed.  DSMF ¶ 11; PRDSMF ¶ 11.  On November 5, 2012, Nurse Patterson submitted a "keep on person" (KOP) authorization for Mr. Belskis' diabetic shoes that had been taken from him during the booking intake.  DSMF ¶ 12; PRDSMF ¶ 12.  On November 5, 2012, the corrections office staff denied Nurse Patterson's KOP authorization.  DSMF ¶ 13; PRDSMF ¶ 13.

Medpro policy requires that an inmate seeking medical attention must under normal circumstances submit an "Inmate Request Form" (IRF).  DSMF ¶ 145; PRDSMF ¶ 145.  Inmates are instructed by Medpro staff concerning the use of the form.  *Id.*  Consistent with Medpro standard practice, Nurse Patterson documented that she made Mr. Belskis aware that if he had any medical issues, he could submit a request for medical treatment either the IRF or one captioned "Inmate Medical Request" (IMR).  DSMF ¶¶ 9, 145; PRDSMF ¶¶ 9, 145.

On November 6, 2012, Mr. Belskis filled out a request to medical, saying that he "would like to be taken out to have diabetic soft shoes made because [he had been told that] my street diabetic shoe is a security risk at SCJ."  DSMF ¶ 21; PRDSMF ¶ 21; PSAMF ¶ 14; DRPSAMF ¶ 14.[4]  Mr. Belskis understood that the SCJ corrections

---

[4]      There is a slight difference between Medpro's paragraph 21, which quotes Mr. Belskis' statement about the security risk as a fact ("because my diabetic shoe is a security risk at this facility"), DSMF ¶ 21, and Mr. Belskis' paragraph 14, which says that Mr. Belskis "had been told" that his diabetic shoes were a security risk.  PSAMF ¶ 14.  Mr. Belskis admitted Medpro's version, and Medpro admitted Mr. Belskis' version.  PRDSMF ¶ 21; DRPSAMF ¶ 14.  Viewing the facts in the light most favorable to Mr. Belskis, the Court accepted his version and inserted it in Medpro's quotation.

staff did not permit diabetic shoes he was wearing on admission because they presented a security risk. DSMF ¶ 22; PRDSMF ¶ 22. On November 8, 2012, Lisa Cates, RN, Medpro nursing supervisor, responded to Mr. Belskis' IRF, writing that "this is not something the jail will do; you can have another pair dropped off, normally only jail-issued shoes are allowed." PSAMF ¶ 15; DRPSAMF ¶ 15; DSMF ¶ 23; PRDSMF ¶ 23. Nurse Cates' intent was to make Mr. Belskis aware that his best course of immediate action was to have another pair of shoes brought in to determine whether they would comply with SCJ corrections staff's security requirements. DSMF ¶ 24; PRDSMF ¶ 24. Nurse Cates understood that as a federal prisoner, Mr. Belskis would be subject to the United States Marshal Service's (USMS) procedures for obtaining medical care and it would require a doctor's order before an outside appointment or other medical need was submitted. DSMF ¶ 25; PRDSMF ¶ 25. Mr. Belskis never responded to Nurse Cates' note of inquiry of November 8, 2012 and Nurse Cates was not aware he was having foot problems until it was brought to her attention that he had made oral and written requests about foot issues on November 30, 2012 and December 1, 2012 respectively. DSMF ¶ 26; PRDSMF ¶ 26.

Meanwhile, on November 7, 2012, the Medpro medical provider, Robert Ellis, PA-C, reviewed Mr. Belskis' medication list and medical records on November 7, 2012. DSMF ¶ 14; PRDSMF ¶ 14. Physician's Assistant Ellis believed that Nurse Patterson's findings concerning Mr. Belskis were not indicative of any medical problem. DSMF ¶ 15; PRDSMF ¶ 15. Consistent with standard Medpro practice, Mr. Belskis' medical records from the ACJ were received. DSMF ¶ 17; PRDSMF ¶

17. The ACJ medical records revealed, among other things, that Mr. Belskis had an annual physical examination at the ACJ on May 9, 2012. DSMF ¶ 18; PRDSMF ¶ 18. Consistent with Medpro standard practice, Mr. Belskis had an updated annual examination at the SCJ on May 8, 2013. *Id.* Given his stable condition on entry and the prior physical examination at the ACJ in May 2012, Mr. Belskis would not be scheduled to see the provider, namely Physician's Assistant Ellis, unless he was having a specific problem that was brought to the attention of the Medpro staff. DSMF ¶ 19; PRDSMF ¶ 19. Mr. Belskis was aware of the need to submit written request forms because of his prior incarcerations and because he demonstrated his knowledge of this procedure by filing several IRFs unrelated to his feet, including his glasses (11/6 and 11/12), an eyeglass prescription change (11/19/12), and complaints for charges for seeing the provider (12/25/12). DSMF ¶ 20; PRDSMF ¶ 20.

Mr. Belskis had worn specially-made footwear for his diabetes while at the Piscataquis County Jail a few years before and he still had this footwear. PSAMF ¶ 16; DRPSAMF ¶ 16. Mr. Belskis arranged to have his mother bring the footwear to the SCJ and she delivered the shoes to a nurse at the SCJ a few days after his arrival. *Id.* The SCJ, however, denied his request to wear this footwear as well. *Id.*

### E. Medpro's Treatment of Joseph Belskis' Diabetes: An Overview

Although Mr. Belskis had a chronic condition of diabetes, he had no active complications of diabetes. DSMF ¶ 27; PRDSMF ¶ 27. Specifically, there were no signs or symptoms of infection or loss of skin integrity; Mr. Belskis requested and received a routine follow-up and monitoring for his insulin dependent diabetes,

including foot checks. *Id.* One of the foundations for the care of diabetes and prevention of the risks of development of other conditions is the close monitoring of the hemoglobin HgB AIC level. DSMF ¶ 28; PRDSMF ¶ 28. From November 5, 2012 onward, the Medpro medical staff saw Mr. Belskis on a daily basis for purposes of insulin treatment for his diabetes. DSMF ¶ 29; PRDSMF ¶ 29. Mr. Belskis was in the medical unit four times a day for his diabetes sugar checks: before breakfast, lunch, and dinner and before bedtime. *Id.* Mr. Belskis received long-acting insulin twice a day, before breakfast and before bedtime, and he received insulin on an "as needed" basis otherwise during the first three daily visits depending on his insulin levels. DSMF ¶ 30; PRDSMF ¶ 30. Mr. Belskis' HgB AIC levels at the SCJ were markedly better than those at ACJ. *Id.*

### F. Joseph Belskis' Initial Foot Complaints

Mr. Belskis did not complain about his feet until November 30, 2012. DSMF ¶ 31; PRDSMF ¶ 31. The Medpro medical records do not reveal any complaint about foot problems by Mr. Belskis until an oral complaint of November 30, 2012 and his written follow-up on December 1, 2012. DSMF ¶ 32; PRDSMF ¶ 32. On Friday, November 30, 2012, Mr. Belskis complained to a Medpro staff member about foot problems during a routine blood sugar check and he was advised to submit a medical slip. DSMF ¶ 33; PRDSMF ¶ 33. On Saturday, December 1, 2012, Mr. Belskis made out an IMR, requesting to be seen by a doctor for diabetic footwear. PSAMF ¶ 17; DRPSAMF ¶ 17; DSMF ¶ 34; PRDSMF ¶ 34; PSAMF ¶ 17; DRPSAMF ¶ 17. Mr. Belskis submitted his December 1, 2012 IMR in response to the November 30, 2012

oral exchange with Medpro staff. DSMF ¶ 34: PRDSMF ¶ 34. In his December 1, 2012 IMR form, Mr. Belskis described his "problem" as the need "to be seen by the [Doctor] for diabetic ulcer—proper diabetic footwear in [the SCJ] property [locker] . . . ." *Id.* Nurse Cates was not aware of Mr. Belskis' foot complaint until she returned for a full day of work on December 4, 2012. DSMF ¶ 35; PRDSMF ¶ 35. By the time Nurse Cates returned to work on December 4, 2012, another member of the nursing staff had already placed Mr. Belskis on the next available sick call day—December 4—and PA-C Ellis saw him that day. *Id.*

On December 4, 2012, PA-C Ellis saw Mr. Belskis for the first time. DSMF ¶ 36; PRDSMF ¶ 36. PA-C Ellis observed that Mr. Belskis had evidence of a hyperkeratotic area consistent with a healing chronic ulcer on the plantar aspect of the right foot, first metatarsal, and two small areas of redness from shoe irritation, one on the right fifth toe. *Id.* He demonstrated no signs of skin breakdowns and no signs of infection at that time. *Id.* PA-C Ellis noted on December 4:

> Mr. Belskis is a diabetic who has had amputations of toes and chronic diabetic ulcers. He wears orthotic shoes and this was discontinued upon his arrest. [H]e would like to wear them so I'm going to ask the nursing staff to discuss this with the administrative staff to see if they will allow his specialized shoes.

*Id.* As of December 4, 2012, Mr. Belskis did not have a serious medical need or condition related to his right foot. DSMF ¶ 37; PRDSMF ¶ 37. After seeing PA-C Ellis on December 4, 2012, Mr. Belskis left the visit with the understanding that the nursing staff was going to make a request to correctional staff to see if he could get his old diabetic shoes. PSAMF ¶ 18; DRPSAMF ¶ 18.

On December 5, 2012, at PA-C Ellis' request, Nurse Cates asked the on-duty SCJ booking staff if a property person was in to obtain Mr. Belskis' shoes and was advised "no". DSAMF ¶ 38; PRDSMF ¶ 38.

On December 6, 2012, Mr. Belskis completed an IRF for the issuance of prescriptive diabetic shoes or the return of his own diabetic shoes, which had been taken at his admission to the SCJ. DSMF ¶ 39; PRDSMF ¶ 39. On December 6, 2012, Nurse Cates discussed the diabetic shoe issue with PA-C Ellis and SCJ Corrections Sergeant Theresa Brown. DSMD ¶ 40; PRDSMF ¶ 40. Sergeant Brown was made aware of the link between the need for specialized footwear and Mr. Belskis' diabetes. *Id.* Later that day, another Medpro staff member responded to Mr. Belskis, advising him that "we are checking into it". *Id.*

On Friday, December 7, 2012, Nurse Cates executed another KOP slip and submitted it to SCJ corrections staff. DSMF ¶ 41; PRDSMF ¶ 41. SCJ Sergeant Elijah Munn was advised that Mr. Belskis' shoes were worn at ACJ and that Mr. Belskis needed them because of his diabetes and potential medical complication. *Id.* Later on December 7, 2012, Nurse Cates advised Mr. Belskis that "[SCJ] security looked at [his shoes] again and denied [the KOP] due to laces, metal and condition [of the footwear]." DSMF ¶ 42; PRDSMF ¶ 42. Sergeant Munn issued the denial. *Id.* Mr. Belskis never grieved the denial of his diabetic footwear by SCJ corrections staff. DSMF ¶ 43; PRDSMF ¶ 43. Nurse Cates personally made SCJ corrections staff aware that Mr. Belskis needed his diabetic shoes because of his diabetic condition

and that if he did not have his shoes, this could lead to problems with his feet. DSMF ¶ 44; PRDSMF ¶ 44.

On Saturday, December 8, 2012, Mr. Belskis submitted an IRF, asking Medpro "to check if the Federal Bureau of Corrections would pay for a pair of diabetic soft shoe sneakers for my ongoing problem with diabetic ulcers on my feet. So these shoes would *not* be a security risk at any facility I have to enter." DSMF ¶ 45; PRDSMF ¶ 45. Another nursing staff member referred the IRF to the provider. *Id.*

Mr. Belskis was on the sick call list to be seen by the provider concerning his request for diabetic footwear on the next regularly scheduled day, Tuesday, December 11, 2012. DSMF ¶ 46; PRDSMF ¶ 46. For some reason, he was not seen that day. *Id.* Rather than wait until the next sick call day, Nurse Cates called provider PA-C Ellis on Wednesday, December 12, 2012, and explained Mr. Belskis' request. DSMF ¶ 47; PRDSMF ¶ 47. PA-C Ellis issued a verbal order for the prescription for diabetic shoes. *Id.*

Also on December 12, 2012, Nurse Cates contacted Pine Tree Orthopedic (PTO) to receive a cost for the consultation, which is required by the United States Marshal Service (USMS) protocol for submission of outside services. DSMF ¶ 48; PRDSMF ¶ 48. On Thursday, December 13, 2012, Nurse Cates received a quote for the consultation from PTO and submitted a request to the USMS, requesting approval of a consult with PTO in Livermore Falls, Maine "upon recommendation of R. Ellis, PA . . . [as Mr. Belskis] has initially been diagnosed with diabetes [and] needs consult for diabetic [shoes]." DSMF ¶ 49; PRDSMF ¶ 49. After USMS approval, Nurse Cates

contacted PTO and made what she understood was the first available appointment for Mr. Belskis for December 27, 2012. *Id.* The appointment for the initial consult for diabetic footwear was made three days before Mr. Belskis' initial foot problems on December 16, 2012. DSMF ¶ 50; PRDSMF ¶ 50. For some reason, Mr. McDonald did not see Mr. Belskis on December 27, 2012, but on December 28, 2012. *Id.*

### G. Mr. Belskis' Development of a Serious Medical Condition and the Medpro Response

On Sunday, December 16, 2012, Mr. Belskis noticed something wrong with his fifth metatarsal. PSAMF ¶ 19; DRPSAMF ¶ 19. This was the first time Mr. Belskis had noticed a problem with his right foot. DSMF ¶ 52; PRDSMF ¶ 52. On December 16, 2012, Mr. Belskis submitted an IMR to see the medical provider concerning his foot sores. DSMF ¶ 51; PRDSMF ¶ 51. Mr. Belskis also stated that he "would like clog-type shower shoes." *Id.* On December 16, 2012, he saw Licensed Practical Nurse Rhonda Walters and he reported his concern to her.[5] PSAMF ¶ 19; DRPSAMF ¶ 19. This was the first time Mr. Belskis had reported a foot wound to Medpro personnel. DSMF ¶ 53; PRDSMF ¶ 53. Other than the pink area on the metatarsal area that Nurse Patterson noticed on November 5, 2012, the medical treatment of Mr. Belskis establishes that he did not have a serious medical condition related to his right foot until December 16, 2012, at the earliest, when he complained of problems to the

---

[5] Medpro issued a qualified response to this statement of fact, asserting that Mr. Belskis initially refused to be seen by a member of the nursing staff for his December 16, 2012 complaint. DRPSAMF ¶ 19. The Court included this fact in Medpro's paragraph 56.

medical staff.  DSMF ¶ 54; PRDSMF ¶ 54.[6]  PA-C Ellis saw Mr. Belskis in a timely fashion on December 18, 2012.  *Id.*

Medpro standard procedure requires the nursing staff to make an initial contact with the inmate concerning any written inmate request for medical services. DSMF ¶ 55; PRDSMF ¶ 55.  The reasons for this procedure include the need for the nursing staff to make a preliminary assessment and to provide additional details to the provider.  *Id.*  Mr. Belskis initially refused to be seen by the nursing staff on December 16, 2012, but later that day, Nurse Rhonda Walters saw Mr. Belskis and he told her that the "croc [type shoe which was available at SCJ] would work."  DSMF ¶ 56.  Medpro nursing staff checked with SJC Corrections Major David Allen and Major Allen advised that a medical order would be required to obtain a croc-type shoe for Mr. Belskis.  DSMF ¶ 57; PRDSMF ¶ 57.

On Tuesday, December 18, 2012, PA-C Ellis saw Mr. Belskis on follow-up to the December 16, 2012 written IMR.  PSAMF ¶ 20; DRPSAMF ¶ 20; DSMF ¶ 58; PRDSFM ¶ 58.  This was the first opportunity for Mr. Belskis to see the provider in regard to the problem he also wrote about on December 16, 2012.  *Id.*  On December 18, 2012, PA-C Ellis noted that Mr. Belskis "has been unable to wear his orthopedic footwear as it is not jail approved" and that Mr. Belskis has "been in standard Velcro top sneaker which was irritating his foot."  DSMF ¶ 59; PRDSMF ¶ 59.  By December

<hr />

[6]    Medpro's initial statement did not make reference to the pink area on Mr. Belskis' metatarsal on November 5, 2012, when he was booked into the SCJ.  DSMF ¶ 54.  Mr. Belskis issued a qualified response, noting that he presented with a pink area on his metatarsal on November 5, 2012.  PRDSMF ¶ 54.  In accordance with its obligation to view the evidence in the light most favorable to Mr. Belskis, the Court included his qualification.

18, 2012, Mr. Belskis had developed a sore, which was blistered and oozing, on his fifth metatarsal.[7] PSAMF ¶ 21; DSMF ¶ 21.

PA-C Ellis observed a one centimeter pressure spot on the right distal fifth metatarsal and a healing chronic two centimeter spot on the second metatarsal. *Id.* PA-C Ellis submitted a written order for the croc-type shoes and required the nursing staff to begin applying dry dressings daily. *Id.* With the hope that a change in footwear would be less traumatic until his new diabetic shoes were available, PA-C Ellis asked that Mr. Belskis be issued a pair of croc-type shoes generally available only to the female inmates. DSMF ¶ 60; PRDSMF ¶ 60. PA-C Ellis noted that a referral for an orthopedic shoe had already been made and was pending. *Id.*

As of December 18, 2012, PA-C Ellis considered Mr. Belskis to have a serious medical condition or need regarding his right foot and PA-C Ellis recommended daily wound checks with a dry dressing by the nursing staff. DSMF ¶ 61; PRDSMF ¶ 61. The purpose of the daily wound dressing was to pad the area and provide protection. DSMF ¶ 62; PRDSMF ¶ 62. PA-C Ellis also recommended that Mr. Belskis wear socks to provide additional foot protection. *Id.* The dressing was a dry gauze taped on, as jail regulations will not allow the use of roll gauze because of safety concerns; this resulted in the bandage being easily displaced. *Id.* The Medpro staff applied daily dressing changes to Mr. Belskis' foot for foot ulcers from December 19, 2012 through January 17, 2013. DSMF ¶ 70; PRDSMF ¶ 70; DSMF ¶ 73; PRDSMF ¶ 73.

---

[7]     Medpro denied this paragraph, citing the Ellis, Walters and Cates affidavits. DRPSAMF ¶ 21. However, the Court is required to view contested facts in the light most favorable to Mr. Belskis and it has therefore included his recollection of the condition of his toe on December 18, 2012.

The nursing staff reported increasing improvement at daily dressing changes in the fifth metatarsal lesion with decreasing redness and no pain. DSMF ¶ 74; PRDSMF ¶ 74.

On December 18, 2012, Nurse Cates received a memorandum from SCJ corrections staff, Compliance Manager Sean Maguire. DSMF ¶ 63; PRDSMF ¶ 63. Mr. Maguire confirmed the denial of Mr. Belskis' previous diabetic footwear for security reasons. *Id.* Mr. Maguire's December 18, 2012 memorandum stated:

> Inmate [Belskis'] diabetic shoes were denied due to metal eyelets and long shoelaces. Inmate Belskis has been issued a set of crocs and instructed to wear these with socks. The denial of the shoes was reviewed by [Major Corey] Swope and found to meet jail policies on contraband.

DSMF ¶ 64; PRDSMF ¶ 64. Mr. Maguire also noted that Mr. Belskis was not compliant with the request to wear socks for additional protection and that SCJ policy requires all inmates to wear socks as part of the jail uniform, regardless of the type of footwear. DSMF ¶ 65; PRDSMF ¶ 65.

Terry Thurlow is a principal, owner, and the health services administrator of Medpro Associates.[8] *See* DSMF, Attach. 4, *Aff. of Terry Thurlow* ¶ 66. Mr. Thurlow contacted various SCJ personnel and made them aware of the importance of Mr. Belskis having his own diabetic shoes.[9] DSMF ¶ 66; PRDSMF ¶ 66. Mr. Thurlow

---

[8] Medpro introduces Terry Thurlow in its statement of material fact paragraph 66. DSMF ¶ 66. But he is identified only as Mr. Thurlow. *Id.* Mr. Thurlow's affidavit describes his position at Medpro. *Id.* Attach. 4, *Aff. of Terry Thurlow* ¶ 1. The Court has added his description on the assumption that Mr. Belskis does not contest that Mr. Thurlow's relationship with Medpro. Otherwise, Mr. Thurlow's statements are without context.

[9] Neither Medpro's statement of material facts nor Mr. Thurlow's affidavit clarifies when Mr. Thurlow contacted the SCJ personnel. Although the Court included these contacts, they add little because their timing is unknown. By its placement in Medpro's statement of material facts, it could be that Mr. Thurlow made these contacts on December 18, 2012, but this is an assumption.

made SCJ corrections staff, Jail Administrator David Allen and Compliance Officer Sean Maguire, aware that Mr. Belskis needed his diabetic shoes because of his diabetic condition and that if he did not have his shoes, it could lead to problems with his feet. DSMF ¶ 67; PRDSMF ¶ 67.

On December 19, 2012, SCJ corrections staff provided Mr. Belskis with a croc-type shoe. DSMF ¶ 68; PRDSMF ¶ 68. On December 20, 2012, Mr. Belskis was seen by Medpro staff "with new croc style shoes on. [Mr. Belskis] reported he likes them and they don't rub as much." DSMF ¶ 69; PRDSMF ¶ 69. Mr. Belskis did not wear his socks only for brief periods of time; however, on December 20, 2012, when the other Medpro nurse saw Mr. Belskis, he was non-compliant with the request to wear socks.[10] DSMF ¶ 71; PRDSMF ¶ 71. When yet another Medpro nurse saw Mr. Belskis on December 21, 2012, he was compliant with the request to wear socks. DSMF ¶ 72; PRDSMF ¶ 72. Generally, during the time the medical staff at the SCJ was dressing the sore on Mr. Belskis' foot, he did wear socks, though he would not wear them for the walk between the shower and his cell, a short distance. PSAMF ¶ 33; DRPSAMF ¶ 33. Otherwise, Mr. Belskis routinely wore socks for the entire time he was at SCJ.[11]

*Id.*

---

[10]     Medpro's paragraph seventy-one states that when the Medpro nurse saw him on December 20, 2012, he was again non-compliant with the request to wear socks. DSMF ¶ 71. Mr. Belskis denied this paragraph, noting that he did not wear the socks only for brief periods of time. PRDSMF ¶ 71. Mr. Belskis' denial does not directly contradict the Medpro statement. He could have been generally compliant but non-compliant when the Medpro nurse saw him on December 20, 2012. The Court incorporated both statements.

[11]     Medpro issued a qualified response to Mr. Belskis' paragraph thirty-three. DRPSAMF ¶ 33. The qualified response only states: "Qualify (Cates Affidavit ¶¶ 21 and 23)." *Id.* These paragraphs of Nurse Cates' affidavit are the record support for Medpro paragraphs 71 and 72, which the Court has incorporated in the statement of facts, mindful of the requirement to view the facts in the light most favorable to Mr. Belskis.

On Friday, December 28, 2012, Mr. Belskis was escorted to Bruce MacDonald's office at PTO in Livermore Falls, Maine at which time, Mr. MacDonald assessed him to see if he needed diabetic shoes. PSAMF ¶ 22; DRPSAMF ¶ 22; DSMF ¶ 75; PRDSMF ¶ 75.[12] Mr. MacDonald did not have any shoes in stock for Mr. Belskis and so he was going to have some made. PSAMF ¶ 23; DRPSAMF ¶ 23. Mr. Belskis was transported back to SCJ with a note that read: "[Mr. MacDonald] will send [a] letter with recommendations." DSMF ¶ 75; PRDSMF ¶ 75. The note making those recommendations was not sent or received at Medpro until the following Tuesday, December 31, 2012. DSMF ¶ 76; PRDSMF ¶ 76.

Mr. MacDonald's observations of December 28, 2012 contained in the note that Medpro received on December 31, 2012 were not consistent with those observations of the Medpro nursing staff. DSMF ¶ 77; PRDSMF ¶ 77. On December 28, 2012, Medpro staff member Nurse Leavit[13] observed that "the wound appears improved from yesterday slightly more dry than I usually see it." DSMF ¶ 78; PRDSMF ¶ 78. On Mr. Belskis' return from PTO on December 28, 2012, he was seen by another Medpro nurse. DSMF ¶ 79; PRDSMF ¶ 79. Mr. Belskis reported to that nurse that Mr. MacDonald had not looked under his dressing. *Id.* Mr. MacDonald had given a cream to Mr. Belskis, but Medpro staff was still awaiting an order from Mr.

---

[12]    Medpro's paragraph seventy-five refers to "Pine Street Orthopedics", not Pine Tree Orthopedics. DSMF ¶ 75. The Court assumes this was a typographical error.

[13]    Medpro introduces Nurse Leavit in its statement of material fact paragraph 78. DSMF ¶ 78. The statement provides no first name for Nurse Leavit. The record support for the statement is the affidavit of Robert G. Ellis, PA-C, which states: "On December 28, Medpro nursing staff RN Leavit observed that 'the wound appears improved from yesterday slightly more dry than I usually see it." DSMF, Attach. 2, *Aff. of Robert G. Ellis, PA-C* ¶ 10. Nurse Leavit's name appears once in the Medpro statement of material fact.

MacDonald regarding the lotion. DSMF ¶ 80; PRDSMF ¶ 80. A Medpro staff nurse called Mr. MacDonald and Mr. MacDonald advised that he would fax the order. *Id.*

On Monday, December 31, 2012, Nurse Patterson noted the following condition on the right small toe: "[right] pinky toe sore approximately 1 cm round white appeared to have approx. 2mm x 1mm x 1.5 mm deep center with scant amt clear ooze at base. [Patient] reported that it has been oozing slightly." DSMF ¶ 81; PRDSMF ¶ 81. Another Medpro staff member, Nurse Littlefield, called Mr. MacDonald that morning to inquire about his orders, which Medpro had still not yet received. *Id.* Mr. MacDonald finally transmitted his note to Medpro concerning the December 28, 2012 visit with Mr. Belskis via fax at 1:30 p.m. on December 31, 2012.[14] DSMF ¶ 82; PRDSMF ¶ 82. Mr. MacDonald's note concerning his December 28, 2012 visit with Mr. Belskis confirmed that he had no diabetic shoes that would fit Mr. Belskis, but Mr. MacDonald advised that he could order them or make them at his facility. DSMF ¶ 83; PRDSMF ¶ 83.

Licensed Practical Nurse Rhonda Walters saw Mr. Belskis on January 1 and January 2, 2013 for dressing changes. DSMF ¶ 84; PRDSMF ¶ 84. As a result of the changes she saw in his right foot on January 2, 2013, namely an open wound on the right little toe with drainage, she referred him to the provider for further review and direction. *Id.* Later that day, LPN Walters spoke to the provider, PA-C Ellis, who ordered that Mr. Belskis be sent to the Wound Clinic as soon as possible. *Id.*

---

[14] Medpro's paragraph 82 does not clarify whether or not it was 1:30 p.m. on December 31, 2012. However, Nurse Cates' affidavit does. DSMF Attach. 1, *Aff. of Lisa Cates* ¶ 29. The Court included the date for clarity.

Specifically, on Wednesday, January 2, 2013, PA-C Ellis was alerted by the nursing staff that the area on the right fifth toe had opened, and after discussion with the nursing staff, PA-C Ellis was satisfied that no frank signs of infection were noted at that time. DSMF ¶ 85; PRDSMF ¶ 85. On January 2, 2013, SCJ staff requested the USMS on PA-C Ellis' telephone order that Mr. Belskis be seen at the Maine General Hospital Wound Clinic in Waterville. DSMF ¶ 86; PRDSMF ¶ 86. The USMS approved the request later that day. *Id.*

### H. Antibiotics, Wound Care, and Amputation

On Thursday, January 3, 2013, Nurse Cates contacted the Maine General Medical Center (MGMC) Wound Clinic in Waterville, Maine to arrange an appointment for Mr. Belskis as soon as possible. DSMF ¶ 87; PRDSMF ¶ 87. MGMC advised Medpro that the appointment would likely be the following week and arrangements were made for Mr. Belskis to be seen on Thursday, January 10, 2013. *Id.*

On Friday, January 4, 2013, a Medpro staff nurse noted that some foot redness had begun to develop; PA-C Ellis gave a verbal order for antibiotics (Minocycline and Levaquin) and noted that he would see Mr. Belskis at sick call the following day.[15] DSMF ¶ 88; PRDSMF ¶ 88. Antibiotics were started on January 4, 2013, following the clinical signs of infection reported to PA-C Ellis. DSMF ¶ 89; PRDSMF ¶ 89. This

---

[15] In his statement of material fact paragraph 24, Mr. Belskis says that Nurse Laplante saw him on January 4, 2013 and started him on a four-day course of antibiotics. PSAMF ¶ 24. Medpro issued a qualified response, stating that PA-C Ellis prescribed the antibiotics. DRPSAMF ¶ 24. It is not material to the resolution of the motion who prescribed the antibiotics. However the Court accepted Medpro's version because unless they have advance training, nurses generally are not authorized to prescribe medicine, *see* 32 M.R.S. § 2102, and physicians assistants typically are, subject to physician review. 32 M.R.S. § 3300-C.

delay of two days was not a significant delay in terms of treatment and was unlikely to have an impact on Mr. Belskis' ultimate condition, the development of osteomyelitis, and the delay would not have had an effect on the future course of the problem. DSMF ¶ 90; PRDSMF ¶ 90.[16] On January 4, 2013, Nurse Cates confirmed an appointment for Mr. Belskis at the MFMC for January 10, 2013. DSMF ¶ 91; PRDSMF ¶ 91. Also on January 4, 2013, Nurse Cates called PTO and asked Mr. MacDonald to get back to her concerning the next steps to obtain shoes for Mr. Belskis. *Id.* When she did not hear back from Mr. MacDonald, she called him again on January 15, 2013 and left a voice message for him, asking again what the next steps were to obtain shoes for Mr. Belskis. *Id.*

---

[16] Medpro's paragraph ninety reads: This delay of two days was not a significant delay in terms of treatment and was unlikely to have an impact on Mr. Belskis' ultimate condition, the development of osteomyelitis, and the delay would not have had an effect on the future course of the problem. DSMF ¶ 90. For record support, Medpro cites the affidavit of James W. Berry, M.D. *Id.* Attach. 13, *Aff. of James W. Berry, MD* ¶ 7. Mr. Belskis objected on foundational grounds, referring to his additional statement of material fact thirty-five. PRDSMF ¶ 90; PSAMF ¶ 35. His statement of material fact thirty-five reads: The Plaintiff never spoke with, and was never examined by James W. Berry, M.D. Medpro admitted Mr. Belskis' paragraph thirty-five. PSAMF ¶ 35; DRPSAMF ¶ 35.

The dispute about the admissibility of Dr. Berry's testimony would more properly be resolved by a *Daubert* motion or a motion in limine. Here, the parties have just framed the issue—whether a medical doctor's opinion based solely on a records review is admissible—but have offered no authority either way. For purposes of this motion only, the Court overrules Mr. Belskis' objection to Dr. Berry's opinion based on foundational grounds.

Dr. Berry's opinion assumes the accuracy of the medical records in this case and therefore is similar to an expert response to a hypothetical. Furthermore, Dr. Berry was Mr. Ellis' supervising physician. *See* DSMF ¶¶ 137-38; PRDSMF ¶¶ 137-38. As the supervising physician, Dr. Berry would have been charged with making routine judgments about the adequacy of Mr. Ellis' care based on medical records alone since he actually met with Mr. Ellis only every four weeks. DSMF ¶ 138; PRDSMF ¶ 138.

Furthermore, his opinion as to whether a two-day delay in the initiation of antibiotic therapy made a difference in the end medical result is a matter of scientific opinion. Absent actually examining Mr. Belskis in early January 2013, as Mr. Belskis' little toe was amputated in March 2013, it is unclear what additional information Dr. Berry would have been able to obtain on this causation question had he examined Mr. Belskis.

Finally, Mr. Belskis had not proffered a medical opinion contrary to Dr. Berry's causation opinion. Had he done so, the Court would have accepted Mr. Belskis' expert opinion over Dr. Berry's in accordance with its obligation to view contested facts in the light most favorable to the non-movant.

On January 5, 2013, Nurse Cates evaluated Mr. Belskis and noted some redness across the dorsum of the foot, although Mr. Belskis stated that it was improving. DSMF ¶ 93; PRDSMF ¶ 93. In addition, on January 5, 2013, PA-C Ellis evaluated Mr. Belskis and noted some redness across the dorsum of the foot, although Mr. Belskis also told Mr. Ellis that it was improving. DSMF ¶ 94; PRDSMF ¶ 94; DSMF ¶ 104; PRDSMF ¶ 104. Mr. Belskis reported less pain than the day before. DSMF ¶ 104; PRDSMF ¶ 104. Daily dressing changes with antibiotics were continued for the next five days and he was seen by Dr. Lisa Sauer of the MGMC Wound Clinic on January 10, 2013. DSMF ¶¶ 93-94, 104; PRDSMF ¶¶ 93-94, 104; PSAMF ¶ 25; DRPSAMF ¶ 25. On January 10, 2013, Dr. Sauer ordered an MRI, which was done on January 18, 2013. DSMF ¶ 94; PRDSMF ¶ 94.

On January 10, 2013, Dr. Sauer called Medpro at the SCJ regarding Mr. Belskis and spoke with LPN Walters. DSMF ¶ 99; PRDSMF ¶ 99. Dr. Sauer stated that Mr. Belskis told her that Medpro was not allowing him what he needs. *Id.* LPN Walters informed Dr. Sauer that an orthopedic approval goes through corrections administration for safety concerns in a correctional setting and that his current orthopedic shoes were not approved by SCJ administration, Major Swope. *Id.* Dr. Sauer advised LPN Walters that she was requesting an MRI of his foot. DSMF ¶ 100; PRDSMF ¶ 100. LPN Walters advised Dr. Sauer that an appointment for his shoes was pending before the January 10, 2013 appointment with Dr. Sauer. *Id.* Dr. Sauer also wanted to know exactly what was needed for modifications for Mr. Belskis' current shoes. DSMF ¶ 101; PRDSMF ¶ 101. LPN Walters asked Dr. Sauer to send

a request, specifying what she would like to have and LPN Walters said she would speak with SCJ corrections administration. *Id.*

In response to the information concerning self-injury, Dr. Sauer stated that she did not obtain that history and that she can only believe what the patient tells her.[17]  DSMF ¶ 103; PRDSMF ¶ 103.  LPN Walters told Dr. Sauer that Mr. Belskis is not being neglected as he reported to Dr. Sauer, and that Medpro is doing what is medically necessary under the corrections administration and the USMS Guidelines. *Id.*  The call concluded with LPN Walters advising Dr. Sauer that if she needed anything further from Medpro, she should please not hesitate to let Medpro know. *Id.*  Mr. Belskis did not inflict wounds on his foot while he was housed at the SCJ, either by rubbing/hitting his foot on his bunk or otherwise.[18]  PSAMF ¶ 32; DRPSAMF ¶ 32.

Mr. MacDonald's office returned the call on January 15, 2013 and made an appointment for January 17, 2013 for Mr. Belskis to be molded for shoes.  DSMF ¶ 95; PRDSMF ¶ 95.  A fax was sent to the USMS on January 15, 2013 for approval of the shoes, which were approved. *Id.*  Mr. Belskis returned to see Mr. MacDonald on January 17, 2013, to get a mold made of his feet for the diabetic shoes.  PSAMF ¶ 26; DRPSAMF ¶ 26.

---

[17]     In its paragraph 102, Medpro asserts that LPN Walters told Dr. Sauer that Mr. Belskis admitted to her that he had been inflicting wounds to his feet by rubbing and/or hitting his foot on his bunk and that Mr. Belskis told her this in the course of his routine daily for insulin checks.  DSMF ¶ 102.  Mr. Belskis denied making such statements.  PRDSMF ¶ 102.  In accordance with its obligation to view the evidence in the light most favorable to Mr. Belskis, the Court omitted Medpro paragraph 102.

[18]     Medpro denied this statement, but the Court has included it because it is required to view the facts in the light most favorable to Mr. Belskis.

Medpro staff made no fewer than five telephone calls to PTO from Mr. Belskis' initial visit on December 28, 2012 through February 15, 2013, trying to expedite the production of custom-made shoes. DSMF ¶ 96; PRDSMF ¶ 96. PTO finally saw Mr. Belskis in follow-up and he was provided new diabetic shoes from PTO on February 19, 2013. *Id.*

The passage of time for Mr. Belskis to obtain his shoes was within customary practice. DSMF ¶ 97; PRDSMF ¶ 97. It is not unusual for there to be a delay of six weeks to two months for a custom pair of diabetic shoes to be molded and fitted for a diabetic patient. *Id.* Mr. Belskis currently wears diabetic shoes as his regular footwear and from the time his feet were molded until he received the shoes, it was about two-and-one-half weeks.[19] PSAMF ¶ 34; DRPSAMF ¶ 34.[20]

On January 18, 2013, Mr. Belskis no longer had an open wound to treat so dressing changes were discontinued. DSMF ¶ 105; PRDSMF ¶ 105. Daily foot checks and dry dressing if needed were continued from January 18, 2013 until February 10, 2013. DSMF ¶ 106; PRDSMF ¶ 106. On January 18, 2013, Mr. Belskis was taken to Redington Fairview Hospital in Skowhegan for the MRI ordered by Dr. Sauer. DSMF ¶ 107; PRDSMF ¶ 107; PSAMF ¶ 27; DRPSAMF ¶ 27. Dr. Sauer had ordered the

---

[19] The parties issued qualified responses to Medpro's paragraph 97 and to Mr. Belskis' paragraph 34. The Court included both paragraphs, which cures both qualified responses.

[20] Medpro's paragraph 98 states: The only significant delays in Mr. Belskis' case was the approximately two week delay by PTO between the time of the request and the date of initial consultation appointment in December 2012, and then another two week delay for the foot molding appointment that eventually occurred on January 17, 2013. DSMF ¶ 98. Mr. Belskis denied this statement, noting that there was a significant delay between his first request on November 6, 2012 and the eventual visit for a fitting. PRDSMF ¶ 98. He also notes that there was a significant delay in his being started on antibiotics. *Id.* Viewing the facts in the light most favorable to Mr. Belskis, the Court has not included Medpro paragraph 98.

MRI to rule out osteomyelitis.  *Id.*  The MRI showed suspicion of osteomyelitis of the right fifth toe.  *Id.*  At this time, the ulcer had healed over.  *Id.*  Dr. Anthony C. Van Dyck's reading of the MRI confirmed an infection in the bone, which is consistent with the diagnosis of osteomyelitis.  *Id.*  Mr. Belskis returned to the Wound Center at MGMC on January 31, 2013 to see Dr. Sauer and she told him that the bone was infected.  PSAMF ¶ 28; DRPSAMF ¶ 28.

PA-C Ellis spoke with Dr. Sauer about the MRI results and further action; Dr. Sauer recommended either six weeks of IV antibiotics or referral to an orthopedic surgeon for consideration of amputation.  *Id.*  Mr. Ellis spoke with Mr. Belskis twice about Dr. Sauer's recommendations.  DSMF ¶ 109; PRDSMF ¶ 109.  At first Mr. Belskis was not sure and said he wanted to think about it, and was uncertain what course of action to pursue.  *Id.*; DSMF ¶ 112; PRDSMF ¶ 112.  He then decided to go forward with the amputation stating he did not want to have IV antibiotics while in jail.  *Id.*  On January 23, 24, 25, and 26, 2013, Mr. Belskis refused foot checks and on January 26, 2013, the Medpro staff contacted the provider to inform him of this.  DSMF ¶ 110; PRDSMF ¶ 110.

On February 5, 2013, Mr. Belskis submitted an Informal Request for Remedy (Level 1 Grievance), concerning his medical treatment options.  DSMF ¶ 111; PRDSMF ¶ 111.  On February 7, 2013, PA-C Ellis saw Mr. Belskis concerning his request, Dr. Sauer's findings of osteomyelitis, and the treatment options of amputation or intravenous antibiotics.  *Id.*  At the February 7, 2013 visit, PA-C Ellis explained that IV antibiotics treatment could be done at the SCJ infirmary if Mr.

Belskis wished. DSMF ¶ 113; PRDSMF ¶ 113. Because he believed that amputation was the best course given his history, Mr. Belskis declined IV antibiotic treatment and advised PA-C Ellis that he preferred amputation to be done by James Timoney, DO, who had performed Mr. Belskis' other foot amputations.[21] *Id.* As a result of this visit with Mr. Belskis, the plan on February 7, 2013 was to schedule a referral date with Dr. Timoney. DSMF ¶ 114; PRDSMF ¶ 114. On Thursday, February 7, 2013, Nurse Cates spoke with PTO and PTO informed her that Mr. Belskis' shoes were "in production and should be ready tomorrow or Monday." DSMF ¶ 115; PRDSMF ¶ 115. PTO informed Nurse Cates that once the shoes were ready, Mr. Macdonald would call to set up an appointment for a fitting. *Id.*

From February 11, 2013 to February 28, 2013, Mr. Belskis refused daily foot checks. DSMF ¶ 116; PRDSMF ¶ 116. On Thursday, February 14, 2013, PTO called and advised that the shoes were ready and eventually an appointment for a fitting was made for Tuesday, February 19, 2013. DSMF ¶ 117; PRDSMF ¶ 117. Mr. Belskis returned from that appointment with his shoes, a printout of instructions for them, and pairs of specialty socks. *Id.*; PSAMF ¶ 30; DRPSAMF ¶ 30.

On February 15, 2013, Mr. Belskis was taken to Central Maine Orthopedics (CMO) for a consultation with Dr. Timoney. DSMF ¶ 118; PRDSMF ¶ 118; PSAMF ¶ 29; DRPSAMF ¶ 29. At the February 15, 2013 consultation with Dr. Timoney, Mr. Belskis denied any traumatic event to his right fifth toe and stated that he started

---

[21] Mr. Belskis qualified his response to Medpro paragraph 113 to assert that he elected the amputation because he believed it was the best course, given his history. PRDSMF ¶ 113. The Court included Mr. Belskis' qualification.

feeling pain in December 2012. *Id.* On March 1, 2013, Mr. Belskis was taken to CMO for a follow-up consultation with Dr. Timoney. DSMF ¶ 119; PRDSMF ¶ 119. On March 11, 2013, Dr. Timoney conducted an amputation of the right small toe or fifth metatarsal. *Id.*; PSAMF ¶ 31; DRPSAMF ¶ 31. Following the surgery, Dr. Timoney issued discharge instructions for post-surgical recuperation. *Id.*

Mr. Belskis was returned to the SCJ after surgery and spent a short time in the Medpro infirmary in post-surgical recuperation before being discharged to his regular housing unit. DSMF ¶ 120; PRDSMF ¶ 120. He recovered well and without incident from the surgery during his stay at the SCJ infirmary. *Id.* After the March 11, 2013 surgery, daily foot checks and dressing changes resumed. DSMF ¶ 121; PRDSMF ¶ 121.

On March 21, 2013, Mr. Belskis submitted an IRF requesting information concerning an alleged delay in his receiving diabetic footwear. DSMF ¶ 122; PRDSMF ¶ 122. On March 25, 2013, PA-C Ellis saw Mr. Belskis for follow-up on the March 21, 2013 request. *Id.* At the March 25, 2013 consult, provider and patient agreed that Mr. Belskis' problems, which resulted in his amputation by Dr. Timoney on March 11, 2013, were an "exacerbation of an ongoing chronic problem . . . that was probably smoldering following a long bout with diabetic foot ulcers care while he was in another jail."[22] DSMF ¶ 123; PRDSMF ¶ 123.

---

[22] Not unreasonably, Mr. Belskis objects to this statement, pointing out that there is no evidence of any chronic problem such as the one described. PRDSMF ¶ 123. Mr. Belskis cites Medpro's paragraphs 11, 15, and 16, all of which confirm that his previous wound had completely healed by November 5, 2013, the day of his booking at SCJ, that PA-C Ellis believed he had no medical problem as of November 5, 2013, and Nurse Patterson's observations on November 5, 2013 had nothing to do with Mr. Belskis' ultimate problems with his toe. *Id.* (citing DSMF ¶¶ 11, 15, 16).

## I.    Subjective Awareness[23]

As of December 16, 2012, Mr. Belskis was seen by the provider at the first opportunity, two days after making his request.  DSMF ¶ 128; PRDSMF ¶ 128.

## J.    SCJ Health Management Policies

SCJ Policies 12.1 entitled "Health Care Management" and 12.2 entitled "Health Care Screening and Services" are the official policies of the SCJ and were in effect of the date of the incident in this lawsuit.  PSAMF ¶ 36; DRPSAMF ¶ 36.  SCJ Policy 12.1 provides that "No non-medical staff member will deny an inmate access to treatment or evaluation of medical or mental health problems."  PSAMF ¶ 37; DRPSAMF ¶ 37.  SCJ Policy 12.1 also provides that "All matters of medical judgment are the sole province of the physicians or dentists working for, or under contract with, the SCJ; however, the unified Health Authority has the final clinical authority in all cases.  PSAMF ¶ 38; DRPSAMF ¶ 38.  SCJ Policy 12.1 further provides that "Medical staff members are obligated to be aware of inmates with special medical problems that may require specific interventions and the associated signs and symptoms.  PSAMF ¶ 39; DRPSAMF ¶ 39.

## K.    Medpro: Medical Provider at SCJ

In order to provide medical treatment to SCJ inmates, Somerset County contracts with Medpro Associates to provide medical services.   PSAMF ¶ 40;

---

The Court acknowledges that there is an apparent conflict.  However, Mr. Belskis has not alleged that the contents of paragraph 123 are incorrect.  In other words, PA-C Ellis and Mr. Belskis did have this conversation.  Accordingly, the Court included it.

[23]    In paragraphs 124 through 131, Medpro postulates a number of statements and Mr. Belskis objects to all, except paragraph 128 above.  The Court agrees with Mr. Belskis that the statements are argumentative, conclusory and cloak legal conclusions as statements of undisputed fact.  The Court sustains all of Mr. Belskis' objections and omits the paragraphs from the statement of facts.

DRPSAMF ¶ 40.  Since 2006, Medpro Associates has been under contract to provide

medical healthcare services to inmates incarcerated at SCJ.  DSMF ¶ 132; PRDSMF

¶ 132.  Decisions as to diagnosis of injuries and illnesses, and the appropriateness of

treatment are decisions within the purview of the SCJ's medical provider.  PSAMF ¶

41; DRPSAMF ¶ 41.  As the contractor to provide medical services at SCJ, Medpro

operates in a facility in East Madison that is wholly owned and controlled by

Somerset County.  DSMF ¶ 133; PRDSMF ¶ 133.

(1) Medpro occupies a space within the secure perimeter of SCJ that is owned and controlled by SCJ;
(2) SCJ personnel conduct background checks, similar to checks undertaken for potential law enforcement officials in Maine on all potential Medpro hires;
(3) SCJ and the Somerset County Sheriff have the ultimate say on who has access to SCJ and the medical facility;
(4) All Medpro employees work at the discretion of the Somerset County Sheriff;
(5) Medpro employees work in close cooperation with SCJ corrections staff in providing inmates with access to medical care;
(6) SCJ and Medpro policies concerning medical care are reviewed by the Maine Department of Corrections (MDOC);
(7) In addition, Medpro Health Services Administrator (HSA) Terry Thurlow reviews Medpro policies on a yearly basis;
(8) MDOC monitors the medical care provided by Medpro on a regular basis with the use of its MDOC medical personnel;
(9) During the time of Mr. Belskis' stay at SCJ, the SCJ employed a compliance manager, Sean Maguire, to oversee Medpro's compliance with MDOC standards and regulations for medical care in correctional facilities;
(10) HSA Thurlow works jointly with Mr. Maguire to ensure that MDOC standards have been met.

*Id.*  During the time Mr. Belskis was an inmate at SCJ, November 5, 2012 to August

30, 2013, Medpro staffed the SCJ medical facility with the following personnel:

(1) A RN level nurse from 6:00 a.m. to 2:00 p.m. – seven days a week;
(2) A RN level nurse from 2:00 p.m. to 10:00 p.m. – seven days a week;

<ol start="3">
<li>(3) A RN level nursing supervisor from 7 a.m. to 4 p.m. – five days a week;</li>
<li>(4) A medical secretary from 8:00 a.m. to 4:00 p.m. – five days a week;</li>
<li>(5) A med tech or cna-m at 8:00 a.m., 2 p.m. and 8 p.m. – seven days a week;</li>
<li>(6) A PA-C provider Tuesdays and Thursdays and otherwise on 24/7 call;</li>
<li>(7) A medical director, MD level, on call 24/7; and</li>
<li>(8) HSA on call 24/7 with presence at SCJ at least three days a week.</li>
</ol>

DSMF ¶ 134; PRDSMF ¶ 134. The staffing levels in place at the time of Mr. Belskis' incarceration were consistent with the requirements of Medpro's contract with SCJ. DSMF ¶ 125; PRDSMF ¶ 135.

Several Medpro employees provided care to Mr. Belskis. DSMF ¶ 136; PRDSMF ¶ 136. The "provider" level health care professional during Mr. Belskis' time at SCJ was PA-C Robert G. Ellis. DSMF ¶ 137; PRDSMF ¶ 137. The Medical Director was James Berry, M.D. *Id.* Dr. Berry did not have regular visitation hours at SCJ but was available to the provider and other staff on a 24-hour, on-call basis. *Id.* In addition, Dr. Berry served as the supervising physician for PA-C Ellis and, as required by the Board of Licensure in Medicine, Dr. Berry met with Mr. Ellis approximately every four weeks. DSMF ¶ 138; PRDSMF ¶ 138.

It is Medpro policy that all inmates at SCJ receive medically necessary healthcare. DSMF ¶ 139; PRDSMF ¶ 139. It is also the policy of Medpro that all inmates housed at SCJ for the USMS will receive medically necessary care while at SCJ. DSMF ¶ 140; PRDSMF ¶ 140. The medication provided to USMS inmates by Medpro, such as Mr. Belskis' insulin, is directly billed to the USMS by the pharmacy used by Medpro. DSMF ¶ 141; PRDSMF ¶ 141. Any outside care required by USMS inmates is also reimbursed directly by the USMS. *Id.*

By Medpro policy and procedure, any time outside medical services are required by an inmate housed for the USMS, Medpro is required to fax a request for pre-approval of medical services to the USMS. DSMF ¶ 142; PRDSMF ¶ 142. The required preapproval was done for every outside medical service required for Mr. Belskis. DSMF ¶ 143; PRDSMF ¶ 143. Medpro is not aware of any denials of requests for preapproval of medical services by the USMS in connection with Mr. Belskis' care while at SCJ. *Id.* Mr. Belskis' medical care at SCJ did not cost Medpro or SCJ any additional money. DSMF ¶ 144; PRDSMF ¶ 144. Neither Medpro nor SCJ had a financial incentive to provide less care to Mr. Belskis than other inmates. *Id.*

## L.     Administrative Exhaustion

The SCJ grievance policy provides that a grievance may be initiated by an inmate for an alleged violation of civil, constitutional, or statutory rights; an alleged criminal or prohibited act by a staff member; or to resolve a condition existing within the facility that creates unsafe or unsanitary living conditions; or to resolve a chronic condition existing within the facility that contradicts the Detention and Correctional Standards for Maine Counties and Municipalities. DSMF ¶ 146; PRDSMF ¶ 146. The first step in the grievance procedure is for an inmate to file a Level 1 grievance. DSMF ¶ 147; PRDSMF ¶ 147. If an inmate is not satisfied with the response to a Level 1 grievance, the inmate may file a Level 2 grievance. *Id.* If an inmate is still not satisfied, after receiving a response to a Level 2 grievance, the inmate may file a grievance with the MDOC. DSMF ¶ 148; PRDSMF ¶ 148. This is the final step in the SCJ grievance procedure. *Id.* The grievance policy is outlined in the SCJ Inmate

Handbook, which is provided to all inmates, including Mr. Belskis, upon entry into the SCJ. DSMF ¶ 149; PRDSMF ¶ 149.

Mr. Belskis filed three grievances about his shoes. DSMF ¶ 150; PRDSMF ¶ 150; PSAMF ¶ 42; DRPSAMF ¶ 42. He filed a Level 1 grievance on January 3, 2013, requesting that he be taken to a wound care center immediately to address wounds on his right foot that developed because of improper footwear. *Id.* Mr. Belskis filed a second Level 1 grievance dated February 5, 2013. DSMF ¶ 151; PRDSMF ¶ 151; PSAMF ¶ 43; DRPSAMF ¶ 43. In his February 5, 2013 grievance, Mr. Belskis wrote:

> Health Care Provider: this was my ongoing point to you and staff about my severity of my medical issues with my feet and the importance of having diabetic shoes from November 5, 2012 on now some 88 days later Dr. Lisa Sauer from Waterville's General Hospital tell me of my now bone infection. Don't you think that scheduling visits for antibiotics regimen and surgery of the infected bone should be done in a timely manner so there's less of a chance of more bone infection. This is not an unreasonable request.

PSAMF ¶ 44; DRPSAMF ¶ 44. Mr. Belskis filed only one Level 2 grievance related to issues with his foot, which is dated February 14, 2013. DSMF ¶ 152; PRDSMF ¶ 152; PSAMF ¶ 45; DRPSAMF ¶ 45. It read:

> My medical issues have been documented; I have followed protocol. I have been patient all the while my condition worsens, jeopardizing my livelihood. I need to see a surgeon as to have my toe amputated before the bone infection spreads and my leg is endangered. I'm filing this level two grievance to document the seriousness of the matter.

PSAMF ¶ 46; DRPSAMF ¶ 46. Mr. Belskis never received a response to his Level 2 grievance. PSAMF ¶ 47; DRPSAMF ¶ 47. Mr. Belskis did not write the MDOC concerning issues from any of these grievances. DSMF ¶ 153; PRDSMF ¶ 153.

## III. LEGAL STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). A fact is "material" if it "has the potential to change the outcome of the suit." *Tropigas de Puerto Rico, Inc. v. Certain Underwriters at Lloyd's of London*, 637 F.3d 53, 56 (1st Cir. 2011) (quoting *Borges ex rel. S.M.B.W. v. Serrano-Isern*, 605 F.3d 1, 5 (1st Cir. 2010)). A dispute is "genuine" if "a reasonable jury could resolve the point in favor of the nonmoving party." *Id.* (quoting *McCarthy v. Nw. Airlines, Inc.*, 56 F.3d 313, 315 (1st Cir. 1995)).

Once this evidence is supplied by the moving party, the nonmovant must "produce 'specific facts, in suitable evidentiary form, to . . . establish the presence of a trialworthy issue.'" *Triangle Trading Co., Inc. v. Robroy Indus., Inc.*, 200 F.3d 1, 2 (1st Cir. 1999) (quoting *Morris v. Gov't Dev. Bank of Puerto Rico*, 27 F.3d 746, 748 (1st Cir. 1994)). In other words, the nonmoving party must "present 'enough competent evidence' to enable a factfinder to decide in its favor on the disputed claims." *Carroll v. Xerox Corp.*, 294 F.3d 231, 237 (1st Cir. 2002) (quoting *Goldman v. First Nat'l Bank of Bos.*, 985 F.2d 1113, 1116 (1st Cir. 1993)). The Court then "views the facts and draws all reasonable inferences in favor of the nonmoving party." *Ophthalmic Surgeons, Ltd. v. Paychex, Inc.*, 632 F.3d 31, 35 (1st Cir. 2011). However, the Court "afford[s] no evidentiary weight to 'conclusory allegations, empty rhetoric, unsupported speculation, or evidence which, in the aggregate, is less than significantly probative.'" *Tropigas*, 637 F.3d at 56 (quoting *Rogan v. City of Boston*,

267 F.3d 24, 27 (1st Cir. 2001)); *accord Sutliffe v. Epping Sch. Dist.*, 584 F.3d 314, 325 (1st Cir. 2009).

## IV. THE PARTIES' POSITIONS

### A. The Medpro Defendants' Position

#### 1. Failure to Exhaust Administrative Remedies

Quoting the Prison Litigation Reform Act (PLRA), Medpro points out that "[no] action shall be brought with respect to prison conditions under Section 1979 or the Revised Statutes of the United States (42 U.S.C. § 1983), or any other federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." *Medpro's Mot.* at 11 (quoting 42 U.S.C. § 1997e(1)). Medpro states that "[i]n spite of his diabetic shoes being denied him on admission on November 5, 2012, Mr. Belskis filed no grievance until four (4) days *before* receiving his new boots." *Id.* at 12 (emphasis in original). Medpro says that Mr. Belskis' "only grievance with respect to his foot was dated February 14, 2013." *Id.* at 12. It asserts that he "did not file any grievances with the [MDOC] concerning his foot while at SCJ" and [b]y failing to file a Level 2 grievance or the next level grievance to the [MCOC], Mr. Belskis failed to exhaust his administrative remedies and his claims against the Medpro Defendants are barred." *Id.* at 12-13.

#### 2. Deliberate Indifference

To succeed on his Eighth Amendment claim, Medpro states that Mr. Belskis must establish that the treatment and care he received from it involved "acts or

omissions sufficiently harmful to evidence deliberate indifference to serious medical needs." *Id.* at 13 (quoting *Ruiz-Rosa v. Rullan*, 485 F.3d 150, 156 (1st Cir. 2007). Medpro contends that a "serious medical need was not present until December 16." *Id.* at 14. Furthermore, Medpro argues that the evidence "fails to establish that any Medpro staff member had the culpable state of mind required to inflict pain or deliberately ignore Mr. Belskis' care after December 16." *Id.* Medpro also maintains that the individual Medpro Defendants are entitled to qualified immunity or a "good faith defense." *Id.* at 15-19. Next, separately analyzing the evidence against each individual Medpro Defendant, Medpro argues that the record fails to establish deliberate indifference against any specific individual. *Id.* at 19-27. Finally, Medpro asserts that the allegations against DT Developers, Inc. are too threadbare to satisfy pleading standards. *Id.* at 27-18.

## B. Joseph Belskis' Opposition

### 1. Failure to Exhaust Administrative Remedies

After acknowledging that exhaustion of administrative remedies is mandatory, Mr. Belskis observes that Medpro bears the burden to establish that "there was an available administrative remedy, and that the prisoner did not exhaust that available remedy." *Pl.'s Opp'n* at 6-7 (quoting *Albino v. Baca*, 747 F.3d 1162, 1172 (9th Cir. 2014)) (en banc). Here, Mr. Belskis refers to the Magistrate Judge's recommended decision on Somerset County's motion for summary judgment, which observed that an inmate's right to a Level 3 grievance did not commence until the inmate received the results of the Level 2 grievance. *Id.* at 7-8 (citing *Recommended Decision of*

*County Defs.' Mot. for Summ. J.* at 16 (ECF No. 240)). However, as the Magistrate Judge concluded, there was no evidence in the record that Mr. Belskis ever received a response to the Level 2 grievance and therefore, a question remains as to whether the final level of review was available to Plaintiff. *Id.* at 8.

## 2. Deliberate Indifference

After reciting the applicable standards, Mr. Belskis discusses both the objective and subjective standards for deliberate indifference. Mr. Belskis argues that he met the objective standard for "serious harm" to meet the requirements of a deliberate indifference claim because he had "serious medical needs." *Id.* at 4. Regarding the subjective standards, he points to the delays in obtaining his diabetic footwear to prevent damage to his feet and the delays in prescribing antibiotics once he presented with a sore on his toe. *Id.* at 4-5. He contends that these delays amounted to a denial of prompt medical care sufficient to create genuine issues of material facts on the issue of deliberate indifference. *Id.* Finally he argues that having created a genuine issue of material fact on the issue of deliberate indifference, the individual defendants are not entitled to qualified immunity. *Id.* at 5-6.

## C. Medpro's Reply

In Medpro's view, Mr. Belskis "submitted very few denials or qualifications to the Medpro Defendants['] Statement of Material Facts." *Medpro's Reply* at 2-5. Reviewing Mr. Belskis' responses, Medpro contends that Mr. Belskis "did not have a serious medical condition concerning his feet until December 16." *Id.* at 5. Medpro also observes that on the issue of individual liability, Mr. Belskis only responded to

allegations against two of the Medpro individual Defendants, Nurse Cates and PA-C Ellis. *Id.* Medpro maintains that Mr. Belskis failed to present facts that generate genuine issues against either Medpro employee in their supervisory or individual capacities. *Id.* at 6-8. Futhermore, Medpro argues that Mr. Belskis failed to respond to its contentions regarding Medpro employees, Patterson, Littlefield and Walters, and summary judgment should therefore be granted in their favor. *Id.* at 8-9. Finally, Medpro observes that Mr. Belskis also failed to address the entity liability claim against DT Developers and therefore its motion for summary judgment should be granted. *Id.* at 9.

## V. DISCUSSION

### A. Exhaustion of Administrative Remedies

The Court readily concludes that Medpro's failure to exhaust administrative remedies argument must fail. In its initial memorandum, Medpro argues that because Mr. Belskis failed to file a grievance with the MDOC, he failed to exhaust administrative remedies. *Medpro Mot.* at 12-13. The answer to this issue is found by juxtaposing two statements of material fact: (1) if an inmate is still not satisfied, after receiving a response to a Level 2 grievance, the inmate may file a grievance with the MDOC, DSMF ¶ 148; PRDSMF ¶ 148, and (2) Mr. Belskis never received a response to his Level 2 grievance. PSAMF ¶ 47; DRPSAMF ¶ 47. These conceded statements of fact demonstrate that an inmate is not required to file a Level 3 grievance until he receives the response to his Level 2 grievance and that Mr. Belskis never received a response to his Level 2 grievance.

On these facts, Mr. Belskis did not fail to exhaust his administrative remedies by failing to file a Level 3 grievance, because Medpro failed to establish a prerequisite that would have allowed him to file a Level 3 grievance. Mr. Belskis is not required to grieve a decision he never received. Medpro has not established that Mr. Belskis failed to pursue an "available" administrative remedy. *See Albino*, 747 F.3d at 1172 (Defendant must establish "that there was an *available* administrative remedy") (emphasis supplied).

### B. Deliberate Indifference

The Eighth Amendment prohibits "cruel and unusual punishments." U.S. CONST. amend. VIII. It is well established that "the treatment a prisoner receives in prison and the conditions under which he is confined are subject to scrutiny under the Eighth Amendment." *Farmer v. Brennan*, 511 U.S. 825, 832 (1994) (quoting *Helling v. McKinney*, 509 U.S. 25, 31 (1993)). "Prison officials have a duty to 'provide humane conditions of confinement; prison officials must ensure that inmates receive adequate . . . medical care, and must take reasonable measures to guarantee the safety of the inmates.'" *Giroux v. Somerset County*, 178 F.3d 28, 31 (1st Cir. 1999) (quoting *Farmer*, 511 U.S. at 832).

In order to prevail on his claim against the Medpro Defendants, Mr. Belskis must show that he received treatment and care that involved "acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs." *Ruiz-Rosa*, 485 F.3d at 156. "There is an objective and subjective component to the deliberate indifference inquiry." *Parlin v. Cumberland County*, 659 F. Supp. 2d 201,

208 (D. Me. 2009). "A plaintiff must establish: (1) that he suffered from an objectively serious medical need; and (2) that a prison official was subjectively aware of, yet failed to attend to, this objectively serious medical need." *Id.* (citing *Farmer*, 511 U.S. at 834).

A "serious medical need" is one "that has been diagnosed by a physician as mandating treatment, or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Miranda-Rivera v. Toledo-Dávila*, 813 F.3d 64, 74 (1st Cir. 2016). When Joseph Belskis was admitted to SCJ on transfer from ACJ, Medpro knew from his medical records that he was a diabetic with a history of lower extremity ischemic vascular disease including two prior toe amputations and a history of diabetic foot ulcers. He arrived at SCJ with a history of poorly controlled diabetes, peripheral vascular disease, and previous amputations of the left and right great toes. Mr. Belskis also arrived with a pair of diabetic shoes that were made in 2011; these shoes were brown leather with expanding laces like a rubber band and metal eyelets, similar to a hiking shoe. Medpro also knew that the SCJ staff had confiscated his diabetic shoes and had issued him a pair of canvas shoes with Velcro laces.

From the very outset, Medpro staff concluded that Mr. Belskis required a pair of diabetic shoes. On November 5, 2012, Nurse Mary Patterson recommended that Mr. Belskis be allowed to keep on his person his pair of diabetic shoes, a request denied by the corrections staff. The very next day Mr. Belskis began requesting that he be fitted with a pair of diabetic shoes. Although the record is dense, the fact is

that Mr. Belskis did not receive a pair of diabetic shoes until February 19, 2013, over three months later. It was too late. By then, Mr. Belskis had developed an infection on his toe that required amputation on March 1, 2013.

With this history, the Court easily concludes that Mr. Belskis has raised a genuine issue of material fact as to whether he had a "serious medical condition" within the meaning of the law because he had a condition that had resulted in the past and, if not properly treated, could result in the future and lead to the amputation of one of his body parts. Even a lay person would recognize that a condition that runs a significant risk of amputation is a condition that involves "an unreasonable risk of serious damage to his future health." *Helling*, 509 U.S. at 35. It is also plain that the Medpro professionals "[drew] the inference" of a substantial risk of serious harm because they uniformly recommended the diabetic shoes for Mr. Belskis.

The second prong is the subjective test: whether a prison official, who was subjectively aware of the serious medical need, "failed to act despite his knowledge of a substantial risk of serious harm." *Farmer*, 511 U.S. at 842. "Deliberate indifference" is a state of mind requirement that goes beyond negligence. *Parlin*, 659 F. Supp. 2d at 208 (citing *Estelle v. Gamble*, 429 U.S. 97, 106 (1976)).

What Mr. Belskis' case raises is the extent of the obligation on the part of a prison system's medical staff to advocate for the inmate whose need for medical treatment to prevent a serious medical condition is being denied by the corrections staff. This critical issue is not directly addressed in the dispositive motion. Necessarily, the corrections staff is primarily concerned with the security of the jail,

but there is no evidence in this record that any of the corrections staff who were denying the Medpro request for diabetic shoes were aware that by issuing the denial, Mr. Belskis could well lose a body part. It is the medical staff, not the corrections staff, who are aware of the exact nature of and risks present in Mr. Belskis' medical condition and who must inform the corrections staff, who have ultimate authority over the inmates, of the seriousness and likelihood of the dangers Mr. Belskis was running.

Here, apart from Medpro recommendations to the SCJ corrections staff that Mr. Belskis be allowed to wear proper footwear, there is no evidence in the record to reflect what precisely the Medpro professionals told the SCJ corrections staff about Mr. Belskis' need for diabetic shoes and the risk he ran by wearing prison-issued footwear, namely that one of his body parts would have to be amputated. The record does not reflect whether Medpro's recommendations were pro forma, whether the Medpro professionals impressed upon the corrections staff the potentially dire consequences of their intransigence, and whether the Medpro staff created a sense of urgency in their recommendations to the SCJ corrections staff. Put another way, the record in this case lacks any evidence to rebut the inference that in their dealings with the corrections staff, Medpro acted with "knowledge of impending harm, easily preventable." *DeRosiers v. Moran*, 949 F.2d 15, 19 (1st Cir. 1991). In short, Mr. Belskis has raised a genuine issue of material fact as to whether the Medpro staff did enough to prevent the amputation of his toe.

This conclusion compels the denial of the Medpro Defendants' motion for summary judgment both individually and, as applicable, in their supervisory capacities, since each treatment provider at Medpro was aware of Mr. Belskis' condition and was therefore obligated to attend to the condition by notifying SCJ officials of the risks, and as supervisors, were required not to encourage, condone or acquiesce in the failure to properly advocate for Mr. Belskis.

### C.    The Good Faith Defense

As Mr. Belskis points out, because there is a genuine issue of material fact as to the deliberate indifference of the actors in this case, there is also a genuine issue of material fact as to the availability of qualified immunity.  *Miranda-Rivera v. Toledo-Dávila*, 813 F.3d 64, 75 (1st Cir. 2016); *Belskis v. Somerset Cnty*, No. 1:15-cv-00091-JAW, 2017 U.S. Dist. LEXIS 29359, *22-23 (D. Me. Mar. 2, 2017) ("[B]ecause a genuine issue of fact exists regarding some of the County Defendants' knowledge and conduct, the same facts would raise a genuine issue whether a reasonable officer in their position would have appreciated that such acts or omissions violated clearly established law"); *Martin v. Somerset Cnty*, 387 F. Supp. 2d 65, 79-80 (D. Me. 2005) ("Once a plaintiff creates a genuine dispute of material fact that a defendant was subjectively deliberately indifferent, then the defendant cannot be entitled to qualified immunity on the grounds that a reasonable officer in his or her position would not understand that such conduct violated the plaintiff's rights").

## VI. CONCLUSION

The Court hereby DENIES Medpro's Motion for Summary Judgment (ECF No. 232).

SO ORDERED.

/s/ John A. Woodcock, Jr.
JOHN A. WOODCOCK, JR.
UNITED STATES DISTRICT JUDGE

Dated this 29th day of September, 2017